IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 44182

STATE OF IDAHO,             )
                              )      **Boise, June 2019 Term**

        **Plaintiff-Respondent,**    )

                              )      **Filed:  September 11, 2019**

v.                       )

                              )      **Karel A. Lehrman, Clerk**

**ELDON GALE SAMUEL III,**    )

                              )

        **Defendant-Appellant**    )

                              )

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Benjamin R. Simpson, District Judge.

The judgment of the district court is <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender, Boise, attorneys for Appellant. Maya P. Waldron argued.

Lawrence W. Wasden, Idaho Attorney General, Boise, attorneys for Respondent. Theodore S. Tollefson argued.

---

BEVAN, Justice

## I. NATURE OF THE CASE

Eldon Samuel III appeals from a district court judgment entered after a jury found Samuel guilty of second degree murder for killing his father and first degree murder for killing his brother. We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Samuel was born in California in 1999. Samuel's parents had another son eleven months after Samuel was born. Samuel's younger brother was severely autistic and required significant attention. Both of Samuel's parents had prescription drug addictions which led to financial problems, criminal charges, and arrests. Throughout Samuel's childhood the family lived in shoddy, cockroach-infested residences and moved frequently, usually after they had been evicted for not paying rent. Samuel's mother started abusing pain pills following a car accident when Samuel was 4, became suicidal, and was hospitalized several times. Samuel's father became

addicted to pain pills after he injured his shoulder at work. Samuel's father began to believe that a "zombie apocalypse" was inevitable. Samuel's mother testified that Samuel's father taught him how to kill zombies by playing violent video games, watching zombie themed movies, and training Samuel to use knives and guns.

Samuel witnessed extreme violence growing up. When Samuel was four he watched his father pour lighter fluid on his mother and threaten to burn her alive because he wanted a settlement check she received from a car accident. When Samuel was six he watched his father intentionally drive over his mother, breaking her collar bone. When Samuel was ten his father pointed a gun at his mother's head, bound her with duct tape, and forced Samuel to urinate on her. Child Protective Services were repeatedly contacted in California but never intervened. By 2013, Samuel's mother had left and Samuel's father moved to Idaho with Samuel and his brother. Samuel had frequent visits to the doctor for insomnia, nausea, migraines, blurred vision, and congestion.

On the evening of March 24, 2014, officers responded to a 911 call at Samuel's residence. Samuel told the operator that his brother and dad had been shot. After officers arrived on the scene Samuel was taken to the police station. After originally telling a different version of the events that evening, i.e., initially blaming his father for killing his brother, Samuel eventually described the following events during a police interrogation.

Samuel's father was on medication when he shot a .45 gun outside, believing that a "zombie apocalypse" had begun. Samuel told his father to go back inside. Once his father went inside he pushed Samuel in the chest and told him to leave. Samuel picked up his father's gun, and when his father pushed him a second time, Samuel shot him in the stomach. Samuel's father then crawled to Samuel's brother's room, leaving a trail of blood on the floor. Samuel did not believe the first shot killed his father and shot him three more times in the head once he reached Samuel's brother's room.

After killing his father, Samuel saw his brother hiding under the bed and told him to get out. His brother did not move. Samuel got a shotgun and shot his brother while he was under the bed. Samuel reloaded the shotgun and continued to shoot his brother. Samuel then dropped the shotgun and started to stab at his brother with a knife. Samuel moved the mattress off of the bed frame and got a machete. Samuel swung the machete at his brother through the gaps in the wood planks of the bed frame. When his brother tried to climb out from underneath the bed, Samuel hit

2

him in the back of the head with the machete. Samuel continued to swing the machete as hard as he could until his brother stopped talking and was quiet. Samuel then called 911.

Originally, the State charged Samuel with two counts of first degree murder. However, after a preliminary hearing, the magistrate court found the State had not established probable cause on the premeditation element for the murder of Samuel's father. Thus, Samuel was charged with first degree murder for his brother and second degree murder for his father.

Samuel moved to suppress the statements he made during his police interrogation, arguing that he did not knowingly, intelligently, and voluntarily waive his *Miranda*[1] rights and his statements to the police were not voluntary. In support of his motion, Samuel submitted a forensic mental health examination performed by Dr. Craig Beaver. The district court held that the admissibility of Dr. Beaver's report was conditional on Samuel submitting to a second examination that would be conducted by the State's expert. Samuel declined to meet with the State's mental health expert and the district court excluded Dr. Beaver's testimony. Ultimately, the district court denied Samuel's motion to suppress the interrogation.

The case proceeded to a lengthy jury trial. The defense theory was that Samuel killed his father in self-defense, and that he killed his brother in a rage—committing manslaughter not murder. The jury found Samuel guilty of second degree murder for killing his father, and first degree murder for killing his brother. The district court sentenced Samuel to a unified term of 15 years, with 10 years fixed, for second degree murder, and a concurrent life term, with 20 years fixed, for first degree murder. Samuel timely appealed, arguing that because of multiple errors during his trial, both individually and cumulatively, the court denied Samuel his right to a fair trial.

### III. ISSUES ON APPEAL

1. Whether the district court erred by denying Samuel's motion to suppress because it impermissibly limited the expert mental health evidence Samuel could present by granting the State's motion under Idaho Code section 18-207.

2. Whether the district court erred by denying Samuel's motion to suppress the statements he made during his interview with the police because Samuel did not knowingly, intelligently, and voluntarily waive his *Miranda* rights and his confession was coerced.

3. Whether the district court abused its discretion when it did not allow Samuel to present evidence of specific instances of his father's violent and irrational behavior.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**4.** Whether the district court abused its discretion when it did not allow Samuel's mother to testify that she witnessed Samuel's fear of his father.

**5.** Whether the district court abused its discretion by limiting Dr. Gentile's expert testimony.

**6.** Whether the district court abused its discretion by excluding a portion of Dr. Julien's expert testimony.

**7.** Whether the accumulation of errors, even if individually harmless, deprived Samuel of his right to a fair trial.

**8.** Whether the district court abused its discretion during sentencing.

## IV. ANALYSIS

**A.** **The district court did not err when it granted the State's motion under Idaho Code section 18-207(4)(c), requiring Samuel to submit to an examination by the State's expert if Samuel wanted to present his own expert testimony that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights.**

Samuel moved to suppress his police interrogation alleging that he did not voluntarily, knowingly, and intelligently, waive his *Miranda* rights. In support, Samuel submitted a report from a forensic mental health examination performed by Dr. Craig Beaver. Dr. Beaver opined that Samuel did not appreciate his *Miranda* rights and did not understand his right to remain silent or his right to have legal counsel present. The State filed a motion under Idaho Code section 18-207(4)(c) requesting the opportunity for its own expert to examine Samuel. The defense objected.

After a hearing on the issue, the district court granted the State's motion and held that if Samuel refused to submit to the State's expert for examination, it would lead to excluding Dr. Beaver's testimony at the suppression hearing. The defense filed a motion for reconsideration, which the district court denied, maintaining that Samuel had raised the issue of whether his mental condition prevented him from knowingly, intelligently and voluntarily waiving his *Miranda* rights. The district court reasoned that to deny the State's motion for examination would deprive it of the only adequate means to meet the defense's expert testimony. The State moved to compel the defense to comply with the court's order. Samuel filed a notice of intent to remain silent, stating that Samuel would neither meet with nor talk to the State's mental health expert. The State thus moved to exclude Dr. Beaver's testimony and strike any reference to Dr. Beaver's report. The district court granted the State's motion.

"In reviewing an order granting or denying a motion to suppress evidence, this Court will defer to the trial court's factual findings unless clearly erroneous. However, free review is

4

exercised over a trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found." *State v. Doe*, 137 Idaho 519, 522, 50 P.3d 1014, 1017 (2002) (quoting *State v. Donato*, 135 Idaho 469, 470, 20 P.3d 5, 6 (2001)).

> When a party challenges a statute on constitutional grounds, it "bears the burden of establishing that the statute is unconstitutional and must overcome a strong presumption of validity. Appellate courts are obligated to seek an interpretation of a statute that upholds its constitutionality." *State v. Manzanares*, 152 Idaho 410, 418, 272 P.3d 382, 390 (2012) (quoting *State v. Korsen*, 138 Idaho 706, 711, 69 P.3d 126, 131 (2003)).

*State v. Kelley*, 161 Idaho 686, 689, 390 P.3d 412, 415 (2017).

"The interpretation of a statute must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written." *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 893, 265 P.3d 502, 506 (2011) (internal quotation omitted).

The State's motion was made under Idaho Code section 18-207, which provides:

> (4) No court shall, over the objection of any party, receive the evidence of any expert witness on any issue of mental condition, or permit such evidence to be placed before a jury, unless such evidence is fully subject to the adversarial process in at least the following particulars:

> . . .

> (c) Raising an issue of mental condition in a criminal proceeding shall constitute a waiver of any privilege that might otherwise be interposed to bar the production of evidence on the subject and, upon request, the court shall order that the state's experts shall have access to the defendant in such cases for the purpose of having its own experts conduct an examination in preparation for any legal proceeding at which the defendant's mental condition may be in issue.

I.C. § 18-207(4)(c).

Samuel argues that the district court's granting the State's motion to exclude Dr. Beaver's testimony under Idaho Code section 18-207(4) was erroneous on four grounds. First, section 18-207(4) is unconstitutional because the legislature created procedural rules in violation of the Idaho Constitution. Second, section 18-207(4) does not apply to pretrial motions. Third, section 18-207(4)(c) does not apply under these circumstances because the State, not Samuel, implicated his mental health by claiming his *Miranda* waiver was knowing, intelligent, and voluntary.

Fourth, that section 18-207(4)(c) does not apply because Samuel did not offer expert evidence on his "mental condition."

The State counters that the district court did not err in ruling that if Samuel was allowed to present expert mental health evidence in support of his suppression motion that the State had a right to have its own expert evaluate Samuel. The State maintains that the district court scrutinized all of the evidence and applied the relevant factors before it ultimately denied Samuel's motion to suppress. The State also argues that even if the order to make Samuel available to the State's expert was an error, that error was harmless because the outcome of the suppression motion would have been the same. Similarly, the State argues that even if Samuel had presented Dr. Beaver's evidence it would not have affected the outcome of Samuel's motion.

### 1. Whether the legislature impermissibly created procedural rules in violation of the Idaho Constitution.

First, Samuel alleges that Idaho Code section 18-207 impermissibly reduces the question of a mental condition from the status of a formal defense to that of an evidentiary question. Samuel asserts that the first three sections of section 18-207 pertain to substantive issues: (1) mental condition cannot be an affirmative defense to a criminal charge; (2) correctional authorities must treat the mental condition of convicted person; and (3) expert evidence on the defendant's state of mind as an element of the offense is admissible. I.C. § 18-207(1)–(3). On the other hand, section (4) purports to enact procedural rules governing the introduction of expert evidence about a defendant's "mental condition." I.C. § 18-207(4). The State argues that while at first blush these requirements seem to be procedural evidentiary rules, further examination reveals they are substantive laws because they create, define, and regulate primary rights. The State also asserts that even if Idaho Code section 18-207(4) creates a procedural rule, it does not violate the separation of powers because there is no conflict with the Idaho Rules of Evidence.

"The Idaho Constitution vests the power to enact substantive laws in the Legislature." *In re SRBA Case No. 39576*, 128 Idaho 246, 255, 912 P.2d 614, 623 (1995) (citing Idaho Const. art. III, § 1; *Mead v. Arnell*, 117 Idaho 660, 664, 791 P.2d 410, 414 (1990) ("[O]f Idaho's three branches of government, only the legislature has the power to make 'law.'")). While the legislature has the power to enact substantive law, the Supreme Court holds the inherent power to make rules governing procedure in all of Idaho's courts. I.C. § 1-212. *See also State v. Yoder*, 96 Idaho 651, 654, 534 P.2d 771, 774 (1975) ("This Court has inherent power to formulate rules

6

of practice and procedure within the courts of Idaho."). This Court has held a substantive law "creates, defines, and regulates primary rights" while "practice and procedure pertain to the essentially mechanical operations of the courts by which substantive law, rights, and remedies are effectuated." *SRBA Case No. 39576*, 128 Idaho at 255, 912 P.2d at 623.

Idaho Code section 18-207(4) precludes a party from introducing evidence from an expert witness on any issue of mental condition unless that evidence is fully subjected to the adversarial process in at least these particulars:

> (c) Raising an issue of mental condition in a criminal proceeding shall [1] constitute a waiver of any privilege that might otherwise be interposed to bar the production of evidence on the subject and, [2] upon request, the court shall order that the state's experts shall have access to the defendant in such cases for the purpose of having its own experts conduct an examination in preparation for any legal proceeding at which the defendant's mental condition may be in issue.

We hold that section 18-207(4)(c) is a substantive law because it "defines and regulates" a criminal defendant's substantive right (i.e., "primary right") to submit evidence about his mental health. Additionally, without the provisions of section 18-207(4), there would be no specific provision for acquiring evidence necessary to challenge expert mental health testimony in a criminal case. Thus, the central purpose of this part of the statute is to provide limitations on the *right* to introduce mental health evidence in a criminal case to those circumstances when that evidence can be "fully subject[ed] to the adversarial process." I.C. § 18-207(4). *See also SRBA Case No. 39576*, 128 Idaho at 255, 912 P.2d at 623 (substantive law "creates, defines, and regulates primary rights.")

That said, even if section 18-207(4) created a procedural rule, it does not conflict with the Idaho Criminal Rules. The district court noted that Idaho Criminal Rule 16(c)(4) requires specific compliance with Idaho Code section 18-207:

> (4) Expert Witnesses. On written request of the prosecuting attorney, the defendant must provide a written summary or report of any testimony that the defense intends to introduce pursuant to Rules 702, 703 or 705 of the Idaho Rules of Evidence at trial or hearing. The summary provided must describe the witness's opinions, the facts and data for those opinions and the witness's qualifications. Disclosure of expert opinions regarding mental health must also comply with the requirements of Idaho Code § 18-207. The defense is not required to produce any materials not subject to disclosure under subsection (h) of this Rule, or any material otherwise protected from disclosure by defendant's constitutional rights.

Samuel claims this reference is limited to subsections (a) and (b). The criminal rule is not so restrictive. The rule requires that the defendant "comply" with Idaho Code section 18-207. To "comply" means "[t]o do what is required or requested. . . ." *Comply*, BLACK'S LAW DICTIONARY (11th ed. 2019). The rule is broad and requires that a defendant offering an expert report "do what is required" by the statute, including submit to mental health examination by the State's expert. There is no conflict between Rule 16(c)(4) and subsection (c). Thus, we find no conflict between the Idaho Criminal Rules and Idaho Code section 18-207(4)(c).

*2. Whether Idaho Code section 18-207 applies to pretrial motions.*

Next, Samuel claims that even if the legislature does have the constitutional authority to enact the requirements in section 18-207(4), those requirements do not apply when a defendant claimed his *Miranda* rights were violated; instead, they apply only when the defendant is trying to introduce evidence of his "state of mind" as it relates to an element of the crime charged, or evidence of his "mental condition" as a mitigating factor at sentencing. Again, Idaho Code section 18-207(4)(c) provides:

> (4)  No court shall, over the objection of any party, receive the evidence of any expert witness on any issue of mental condition, or permit such evidence to be placed before a jury, unless such evidence is fully subject to the adversarial process in at least the following particulars:
>
> . . .
>
> (c)  Raising an issue of mental condition *in a criminal proceeding* shall constitute a waiver of any privilege that might otherwise be interposed to bar the production of evidence on the subject and, upon request, the court shall order that the state's experts shall have access to the defendant in such cases for the purpose of having its own experts conduct an examination *in preparation for any legal proceeding* at which the defendant's mental condition may be in issue.

I.C. § 18-207(4)(c) (emphasis added). Samuel argues that "any legal proceeding" is limited by the "criminal proceeding" language, and that "criminal proceeding is synonymous with "criminal action" which is defined as "[t]he proceedings by which a party charged with a public offense is accused and brought to trial and punishment . . . ." I.C. § 19-103. The State argues that this interpretation is contrary to recent Idaho Supreme Court precedent, in which this Court held that section 18-207(4) is not limited to trial and "by its plain language, Idaho Code section 18-207(4) does not have limited application." *State v. Hall*, 163 Idaho 744, 802, 419 P.3d 1042, 1100 (2018), reh'g denied (June 28, 2018). Indeed, in *Hall* this Court reasoned:

8

The plain text of section 18-207(4) does not limit its application to trial. It begins with a statement that *"[n]o court . . . ,"* which is taken to mean no sentencing court as much as it means no trial court (emphasis added). The lack of specificity grants the statute broad application; by its plain language it is applicable to all courts, unless stated otherwise. Additionally, the requirement in subsection (a) that notice be given "ninety (90) days in advance of trial, or other such period as justice may require" refers to trial, but not to the exclusion of sentencing. *Id.* It merely sets a deadline for disclosure, it does not indicate which proceeding that disclosure is applicable to. Subsection (a) provides that the deadline could also be "such other period as justice may require," which further underlines that the reference to trial is solely for the purpose of establishing a timeline, not for limiting the application of the section. *Id.* Similarly, the language in subsection (c) "[r]aising an issue of mental condition *in a criminal proceeding*" does not limit the application of the requirements to trial. I.C. § 18-207(4)(c) (emphasis added). Thus, by its plain language, Idaho Code section 18-207(4) does not have limited application; it is as applicable to sentencing as it is to trial. The district court did not err in concluding that Idaho Code section 18-207(4) applies to sentencing proceedings.

*Id*. (emphasis in original).

The district court looked at the plain language of the statute and held that it applies to the receipt of "evidence of any expert witness *on any issue of mental condition*." (Emphasis in original). The court was correct; the statute does not limit the admission of either direct or rebuttal expert testimony to elements of the crime. To the contrary, the plain language of the statute makes it clear that it applies to any issue of mental condition in any legal proceeding at which the defendant's mental health condition may be an issue. The district court's decision tracks this Court's decision in *Hall*. We now clarify that section 18-207(4), because of the statute's broad application, also applies to legal proceedings before trial, including pretrial motions.

### 3. *Whether the State raised the issue of Samuel's mental condition.*

Next, Samuel argues that even if section 18-207(4)(c) is both constitutionally valid and applies to pretrial issues, that the State's ability to have its expert examine a defendant applies only when the *defendant* raises the issue of his mental condition. Samuel alleges that here the State raised the issue by claiming that Samuel's *Miranda* waiver was knowing, intelligent, and voluntary, when it tried to admit Samuel's statements. The State concedes that it has the burden to show that the defendant made a knowing, voluntary, and intelligent *Miranda* waiver, but asserts that there is no obligation for the State to introduce expert testimony about a defendant's

9

mental condition to meet its burden. The State argues that Samuel raised the issue of his mental condition by filing the motion to suppress and proffering expert testimony from Dr. Beaver.

"The state bears the burden of demonstrating that an individual has voluntarily, intelligently and knowingly waived his rights by a preponderance of the evidence." *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct. App. 1998) (citing *State v. Alger*, 115 Idaho 42, 46, 764 P.2d 119, 123 (Ct. App. 1988)). "Generally, the prosecution can meet its burden of proving a *prima facie* [case] of voluntariness by eliciting from the interrogating officer that the suspect had not been threatened or promised anything and appeared to freely decide for himself to forego the assistance of counsel, and to provide an incriminating statement." *State v. Fabeny*, 132 Idaho 917, 921, 980 P.2d 581, 585 (Ct. App. 1999).

We hold that the district court correctly found that Samuel raised the issue of whether his mental condition prevented him from knowingly, intelligently, and voluntarily waiving his *Miranda* rights. If we were to adopt Samuel's argument, every time the State sought to introduce evidence following a *Miranda* waiver it would allow the defense to introduce un-rebuttable expert testimony. We hold that Samuel raised his mental condition as an issue by including the opinions of a mental health expert when he filed his motion to suppress.

> 4. Whether Dr. Beaver's opinion found that Samuel suffered from a "mental condition."

Lastly, Samuel argues that Dr. Beaver's report did not discuss Samuel's "mental condition"; it merely discussed Samuel's age, education, experience, background, and intelligence—factors the district court had to review when determining whether a juvenile knowingly, intelligently, and voluntarily waived his *Miranda* rights. Samuel claims that Dr. Beaver's opinion was not based on any diagnosis of a "mental condition" and so the district court abused its discretion when it required Samuel to submit to an examination by the State's expert in order to present Dr. Beaver's report. The State counters that while a court has to consider a totality of the circumstances surrounding a *Miranda* waiver, that consideration is not limited to whether a party has raised a mental condition as an issue addressing some of those factors. The State points out that age, experience, background, intelligence, and capacity to understand can be addressed by fact witnesses such as teachers, family members, and friends; so, if the defendant wants to present expert testimony about his particular mental condition as it relates to these facts he has a right to do so, but it opens the door for the State to present competing expert testimony.

Dr. Beaver interviewed Samuel and various family members. Samuel also underwent a neuropsychometric examination four times, for about five hours, where he was subjected to various tests. Dr. Beaver reviewed numerous records and placed significant weight on the transcript summary from Samuel's initial interview with law enforcement and the video recordings of the interview. Ultimately, Dr. Beaver opined:

> In conclusion, based upon my knowledge of Eldon Samuel, multiple interviews and records reviewed, and formal testing completed, it is my opinion Eldon Samuel, then 14 years of age, did not appreciate his Miranda rights and voluntarily waive his Miranda rights. He had significant limitations in his ability to understand his Miranda rights and voluntarily waive them compared to an adult. He shows strong evidence he even has less capacity than would be expected even of a 14 year old. Further, he consistently demonstrated in formal testing, interviewing and in review of the transcripts, not to understand his right to remain silent and, of particular concern, his right to have legal counsel present. Unfortunately, law enforcement did not explain or even attempt to evaluate how well he understood his Miranda rights. Rather, they capitalized on Eldon's young age, immaturity, anxiety and isolation to induce Eldon Samuel to waive his Miranda Rights.

This testimony concerns more than just noting Samuel's age and knowledge; it relates directly to Samuel's mental health by mentioning his "significant limitations" and concluding that he had "less capacity" than a typical 14-year old. We hold that if a defendant wants to present such expert testimony to demonstrate his particular mental condition as it relates to the general factors a court must consider—age, experience, education, background and intelligence—he has subjected himself to the requirements of Idaho Code section 18-207(4), and the State has the right to have its own expert conduct an examination. Thus, the district court properly granted the State's motion under Idaho Code section 18-207(4)(c) and required Samuel to submit to an examination by the State's expert if he wanted to present his own expert testimony that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights.

**B.     The district court did not err by denying Samuel's motion to suppress because the statements he gave to police did not violate his *Miranda* rights and Samuel gave them knowingly, intelligently and voluntarily.**

On March 24, 2014, at about 9:00 p.m., Samuel called 911 to report a shooting. Police officers arrived at Samuel's home, patted him down, and placed him in handcuffs. The officers did not ask Samuel any questions that would elicit incriminating statements during this procedure. At about 9:40 p.m., Samuel was taken to the police station where he was placed into

an interview room. One officer stayed in the room with Samuel, and a few minutes later at least two other officers entered the room. The officers proceeded to take off Samuel's bloody clothing one piece at a time and take photographs. The officers also obtained swabs from Samuel's person. During this process Samuel was asked if he needed anything and Samuel said that he would just like water. Sergeant McCormick informed Samuel that the officers were trying to make sure they preserved any evidence that may have been on Samuel's clothing, and Samuel said that he understood. Afterwards, Samuel was given new clothes, although he did not receive new underwear, socks, or shoes to wear. While removing Samuel's shoes and clothing, the officers repeatedly spoke with Samuel to ensure he was doing all right. The process to photograph, swab, and take Samuel's clothing took about 35–40 minutes.

Two officers then remained in the interrogation room with Samuel, Sergeant McCormick and Detective Wilhelm. Detective Wilhelm, who took the lead in Samuel's interrogation, was Samuel's school's resource officer. Detective Wilhelm asked some preliminary questions such as Samuel's age and contact information, if he was in any physical discomfort, when he last ate, and how well he slept the previous night. Notably, Samuel did not know his phone number or address. In response to a question about whether Samuel was experiencing any physical discomfort, he suggested that he always hurts all over. When asked what he had for dinner Samuel stated that he had two hot dogs with the bun, and two raw hot dogs around 12:00. Samuel also conveyed that he got "good enough" sleep because he takes medication.

After the preliminary matters were concluded, Detective Wilhelm gave Samuel a copy of the *Miranda* waiver form and the following discussion took place:

> Detective Wilhelm: Alright. Well, if you're okay let's get down to why-why we're here to talk today. Is that okay with you?
>
> Samuel: Yeah.
>
> Detective Wilhelm: I'm gonna scoot forward a little bit so I can go over this with you, okay?
>
> Samuel: Okay.
>
> Detective Wilhelm: We didn't go over this in the office, but 99% of the kiddos in my office we give them this warning because sometimes we talk to the parents about what we're gonna talk about and sometimes we won't. Okay? So, I've actually got two of these, so I'm gonna give you that, and then I've got one and I'm gonna explain it to you, okay? So this is a – I've got one for you too, sir.
>
> Sergeant McCormick: Thanks.

Detective Wilhelm: This is a Miranda warning. You know how you see on TV, you see like these cop shows? They're just TV shows. Let me tell ya, they're made up. But they slam guys against the car.

Samuel: (Nods head yes).

Detective Wilhelm: They're slamming them up against the car and then they read these rights to them. And it's kind of at the same time, sometimes they slam up against the car, put them in jail, then they read his rights. And so that's not anything like this. Alright.

Samuel: (Nods head yes).

Detective Wilhelm: These are just some rights that everyone is entitled to. Like if I were to talk to my boss or, um, someone that came to my house and said, "Man, I need to talk to you about this." I probably wouldn't but I could pull out these Miranda rights and, "You know what, Officer Joe, I don't want to talk to you and this is why." Okay? Does that make sense?

Samuel: Yeah. (Nods head yes).

Detective Wilhelm: Okay, so I'm gonna read them to ya, and I'll just read them in order, okay? This is [sic] Miranda warning. It says first you have the right to remain silent. Number two. Anything you say can and will be used against you in a court of law. Third. You have the right to talk to a lawyer and have them present with you while you're being questioned. Good so far?

Samuel: (Nods head yes) Um-hum.

Detective Wilhelm: Okay. So fourth [sic]. If you can't afford to hire a lawyer one will be appointed to represent you before any questioning if you wish on [sic]. So in full print there it says – you're a smart guy. So do you understand each of these rights as I've explained them to you?

Samuel: (Nods head yes).

Detective Wilhelm: Do you understand those rights?

Samuel: Um-hum.

Detective Wilhelm: One through four?

Samuel: Um-hum.

Detective Wilhelm: Okay. Would you mind signing right there?

Samuel: (Grabs pen)

Detective Wilhelm: You sure?

Samuel: Yeah.

Detective Wilhelm: Eldon, can you circle yes for me too, if you don't mind?

Samuel: Yes.

Detective Wilhelm: I didn't know you were a lefty.

13

Samuel: A lefty?

Detective Wilhelm: Yeah. Did you have left handed handcuffs? I'm just teasing you.

Sergeant McCormick: (Laughs)

Samuel: I screwed up.

Detective Wilhelm: I messed you up didn't I? Go ahead and sign. I'm sorry, I'll keep my mouth shut. Can you do me another favor? How about on the date? Can you date it for me? It is still 3/24/14 or it's March 24th 2014, however you wanna write.

Samuel: 3/24?

Detective Wilhelm: 14. 2014.

Samuel: (Signing paper).

Detective Wilhelm: Okay. So hang on to that for just a second okay. Now, that was the tough part. So you said that you understood each of those rights . . .

Samuel: . . . yeah . . .

Detective Wilhelm: . . . as I explained them to you, okay? It's because I did such a great job. Secondly, this, it says having these rights in mind, do you wish to talk to us right now? Do you want to talk to me and my boss about what's going on tonight?

Samuel: Right now?

Detective Wilhelm: Yeah. That's why we're here. Do you wanna talk?

Samuel: Like, where will I, where will I stay?

Detective Wilhelm: Just right here. We'll just chat right here.

Sergeant McCormick: Yeah, we're just gonna chat in this room.

Detective Wilhelm: No, we're not gonna keep you all night. We'll just chat right now. So, this is just – because you have, you have the right to talk to me. Like I said, I have the right to talk to you, so this is just saying having these rights in mind do you want to talk to me right now?

Samuel: Right now?

Detective Wilhelm: Yeah.

Samuel: Like how much time will it take?

Detective Wilhelm: It won't take long.

Sergeant McCormick: Thirty minutes to an hour tops is what I imagine.

Detective Wilhelm: Yeah, I've got stuff to do, so. Do you want to chat?

Samuel: Sure.

14

Detective Wilhelm: Okay. Do you want to do that [sic] same? Do you want to circle yes for me? And then can you put the date?

Samuel: Yeah.

Sergeant McCormick: Lefty, man, I love it.

Detective Wilhelm: I know, and did you see how good I did? I-I kept my mouth shut while you were signing. Okay, so I'm gonna take this real quick, okay? And so I'm gonna sign the bottom.

Afterwards, Samuel said he had to go to the bathroom, and was immediately taken to the bathroom. The interrogation lasted about four-and-a-half hours, during which Samuel made many incriminating statements.

About five months after he was interrogated, Samuel moved to suppress the statements made during the interrogation, which the district court denied. On appeal, Samuel asserts that the district court applied the incorrect legal standard because it improperly muddled the *Miranda* waiver and the voluntariness issues when they should be distinct evaluations. Samuel alleges the district court: (1) failed to consider all of the relevant factors in each analysis; (2) considered the evidence in piecemeal fashion rather than weighing all the evidence in totality; and (3) drew every presumption in favor of the State by dismissing as insignificant, or completely overlooking, evidence favorable to Samuel. Samuel argues that he did not knowingly and intelligently waive his *Miranda* rights. Instead, the officers affirmatively misled a 14-year-old boy about his Fifth Amendment rights by telling him they had a right to talk to him, manipulated him into thinking they were on his side, lied to him about their intentions and his situation, and used physical and psychological coercion to convince him to talk. Last, Samuel argues that even if he did voluntarily waive his *Miranda* rights, his later statements to the police were coerced and not voluntary.

The State argues that Samuel's factual assertions are refuted by the district court's findings of fact and the video evidence. As found by the district court, and apparent from the video, the officers were consistently polite and considerate of Samuel, they respected Samuel's personal space, and overall the interrogation tactics employed did not overbear on Samuel's will. Ultimately, the State asserts the district court applied the proper controlling authority to find Samuel voluntarily waived his *Miranda* rights and then made voluntary statements to the police.

In reviewing a trial court's order granting or denying a motion to suppress evidence, the standard of review is bifurcated. *State v. Draper*, 151 Idaho 576, 592, 261 P.3d 853, 869 (2011)

(citing *State v. Watts*, 142 Idaho 230, 232, 127 P.3d 133, 135 (2005). This Court will accept the trial court's findings of fact unless they are clearly erroneous. *Id*. (citing *State v. Diaz*, 144 Idaho 300, 302, 160 P.3d 739, 741 (2007)). However, this Court freely reviews the trial court's application of constitutional principles in light of the facts found. *Id*.

Whether a defendant has waived *Miranda* rights and whether a confession was voluntary have overlapping—though different—analyses. *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct. App. 1998). "*Miranda* warnings are premised on and designed to protect the Fifth Amendment privilege against self-incrimination, while the exclusion of involuntary confessions is 'grounded in the Due Process Clause of the Fourteenth Amendment, and it applies to any confession that was the product of police coercion, either physical or psychological, or that was otherwise obtained by methods offensive to due process.'" *Id.* (quoting *State v. Doe*, 130 Idaho 811, 814, 948 P.2d 166, 169 (Ct. App. 1997)).

In a 55-page memorandum decision, the district court articulated the following standards to determine whether there was a valid *Miranda* waiver as well as whether the officers coerced Samuel into making a confession:

> In order to make a finding as to whether a confession is voluntary, the Court must consider [the] totality of the circumstances to determine whether the defendant's will was overborne. *State v. Radford*, 134 Idaho 187, 191, 998 P.2d 80, 84 (2000).
>
> To determine whether a juvenile has voluntarily waived his *Miranda* rights, a court must consider "the juvenile's age, experience, education, background and intelligence," and "whether he had the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Doe I*, 137 Idaho 519, 523, 50 P.3d 1014, 1018; *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct. App. 1998) (hereinafter "*Doe II*").
>
> Additionally, "[t]he voluntariness of a confession is determined by consideration of "the effect that the totality of the circumstances had upon the will of the defendant." *Doe II*, 131 Idaho at 713, 963 P.2d at 396 (quoting *State v. Davila*, 127 Idaho 888, 892, 908 P.2d 581, 585 (Ct. App. 1995). In other words, the Court must determine whether the defendant's will was overborne when he confessed as a result of coercive police conduct. *Doe II*, 131 Idaho at 713, 963 P.2d at 396. The Idaho Court of Appeals has stated that in evaluating the voluntariness of a juvenile's confession, consideration must be given to "the child's age, maturity, intelligence, education, experience with police and access to a parent or other supportive adult." *Doe II*, 131 Idaho at 713, 963 P.2d at 396. Additional factors in the voluntariness determination include whether *Miranda*

16

warnings were given, the length of the detention, the repeated and prolonged nature of the questioning, and deprivation of food or sleep. *Id*.

> The State has the burden to provide substantial evidence to demonstrate that under the circumstances [Samuel] voluntarily, knowingly and intelligently waived his *Miranda* rights. *Doe II*, 131 Idaho at 712, 963 P.2d [at] 395.

The district court then considered these factors: age and maturity, experience, education, intelligence, background, access to a parent or supportive adult, whether *Miranda* warnings were given, capacity to understand the warnings, the nature of his rights and the consequences of the waiver, length of the detention and repeated and prolonged nature of the questioning, deprivation of food or sleep, and the presence of coercive interrogation tactics, before concluding:

> Based upon the totality of the circumstances as discussed in detail above, for example [Samuel's] indications that he understood his *Miranda* rights and his use and understanding of sophisticated terminology, the Court finds that [Samuel's] *Miranda* waiver was knowing, intelligent and voluntary.

> Based upon the totality of the circumstances, and pursuant to *Does I and II*, the Court finds that [Samuel's] will was not overborne by police conduct, and therefore his confession was voluntary.

The district court's analysis properly addressed all of the necessary factors on whether there was a valid *Miranda* waiver and whether Samuel's confession was voluntary, even though the factors were all analyzed in the same section of the decision. As Samuel has acknowledged, the voluntariness test and the *Miranda* test overlap.

Samuel also argues that the district court erred by drawing every presumption in favor of the State instead of Samuel. Samuel cites *Colorado v. Spring*, for his assertion that courts must "indulge every reasonable presumption against waiver of fundamental constitutional rights, and . . . not presume acquiescence in the loss of fundamental rights." 479 U.S. 564, 581 (1987). But, as the State points out, Samuel glaringly omitted that this authority came from the dissent in *Springs*. Even so, the State has a heavy burden to overcome the *presumption against waiver*. *State v. Mitchell*, 104 Idaho 493, 497, 660 P.2d 1336, 1340 (1983) (emphasis added). Through this argument Samuel is simply asking this court to re-weigh and second guess the factual findings of the district court. "[I]n a suppression hearing where voluntariness is an issue, 'the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court.'" *Doe II*, 131 Idaho 709, 711, 963 P.2d 392, 394 (Ct. App. 1998) (quoting *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995)). As a result, when the trial court's conclusion that a defendant made a

17

knowing and voluntary waiver is supported by substantial and competent evidence it will not be overturned on appeal unless the findings were erroneous. *Mitchell*, 104 Idaho at 498, 660 P.2d at 1341; *State v. Dunn*, 134 Idaho 165, 170, 997 P.2d 626, 631 (Ct. App. 2000) (explaining where a factual finding is supported by substantial evidence it will not be overturned on appeal.) The district court did not err by weighing the evidence and drawing factual inferences to conclude Samuel voluntarily waived his *Miranda* rights and gave a voluntary confession.

Last, relying on the district court's statement that "[t]here is no indication in the record that [Samuel] had questions or did not otherwise understand the *Miranda* warning, the nature of his *Miranda* rights, the consequences of waiving those rights," Samuel argues that the district court shifted the burden to Samuel to prove he did not understand the *Miranda* waiver. The district court did not shift the burden as Samuel suggests. The district court recognized that "[t]he State has the burden to provide substantial evidence to demonstrate that under the circumstances [Samuel] voluntarily, knowingly and intelligently waived his *Miranda* rights." (citing *Doe II*, 131 Idaho at 712, 963 P.2d [at] 395). The district court found that Samuel indicated he understood his rights at least five times. After signing the waiver form Samuel conveyed one additional time that he understood his rights. The district court appropriately found substantial evidence in the record that Samuel understood his *Miranda* rights, and that the waiver of those rights was knowing, intelligent and voluntary.

> 1. *Samuel made a knowing, intelligent, and voluntary waiver of his Miranda rights.*

Samuel argues that he did not knowingly, intelligently, or voluntarily waive his *Miranda* rights for these reasons: (1) Detective Wilhelm did not clearly and correctly inform Samuel of his rights; (2) Detective Wilhelm did not present Samuel's rights in a way that made sure he actually understood them; (3) Detective Wilhelm trivialized the importance of Samuel's rights and downplayed the severity of his situation; (4) Samuel was in a horrible mental and physical state during the interrogation; (5) Samuel did not have the help of a "friendly adult;" and (6) Samuel's age, immaturity, and lack of education amplified the deficiency of these warnings and coercive force of the officers' tactics.

*Miranda v. Arizona*, 384 U.S. 436 (1966) requires that a person be informed of his or her Fifth Amendment privilege against self-incrimination before custodial interrogation; otherwise incriminating statements are inadmissible. *State v. Hansen*, 138 Idaho 791, 795, 69 P.3d 1052,

1056 (2003) (citing *Doe I*, 137 Idaho 519, 523, 50 P.3d 1014, 1018 (2002)). "A district court's conclusion that a defendant made a knowing and voluntary waiver of his *Miranda* rights will only be disturbed on appeal if the conclusion is not supported by substantial and competent evidence." *State v. Adamcik*, 152 Idaho 445, 468, 272 P.3d 417, 440 (2012) (quoting *State v. Payne*, 146 Idaho 548, 558, 199 P.3d 123, 133 (2008)). While an express written waiver of *Miranda* rights is strong proof of a voluntary waiver, it is not conclusive proof. *Doe I*, 137 Idaho at 523, 50 P.3d at 1018.

When examining a juvenile's waiver of his *Miranda* rights, courts look to the totality of the circumstances.

> The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*State v. Draper*, 151 Idaho 576, 592, 261 P.3d 853, 869 (2011) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)); *see also Doe II*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct. App. 1998).

In *Doe I*, this Court held that a twelve-year-old defendant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights during two interviews with the police. 137 Idaho at 527, 50 P.3d at 1022. This Court recognized that during the first interview the detective had downplayed the importance of *Miranda* warnings by stating he just had to "read . . . this little piece of paper" and stating "[y]ou're going to have to answer some questions." *Id*. at 524, 50 P.3d at 1019. Even so, the detective then carefully recited the warnings to Doe, and Doe made it clear he knew what the warnings were and that they had been read to him before. Doe in fact exercised his rights to end the interview. *Id*. Taking Doe's age and experience into account, the Court found that he knew what *Miranda* rights were. *Id*.

In *Doe II*, the Court of Appeals held that a seventeen-year-old defendant's waiver of his *Miranda* rights was knowing, intelligent, and voluntary. 131 Idaho 709, 712, 963, P.2d 392, 395. In so holding, the Court of Appeals determined that although Doe was not especially sophisticated—he could only read and write at a fourth grade level and had a low level of intelligence—he could both read and understand the words on the form. *Id*.

Here, after Samuel had been in the interrogation room for about an hour, Detective Wilhelm gave him a copy of the *Miranda* form and read Samuel his *Miranda* warning: (1) "you

have the right to remain silent"; (2) "anything you say can and will be used against you in a court of law"; (3) "you have the right to a lawyer and have them present with you while you're being questioned"; and (4) "if you can't afford to hire a lawyer one will be appointed to represent you before any questioning if you wish on [sic]." Detective Wilhelm then confirmed Samuel understood his rights and Samuel signed a written waiver of his *Miranda* rights.

Samuel argues that Detective Wilhelm did not clearly inform him of his rights nor did not he present them in a way that ensured Samuel actually understood them. For example, Detective Wilhelm first told Samuel "you have the right to remain silent;" however, later Detective Wilhelm states, "Like I said, I have the right to talk to you." Samuel also claims Detective Wilhelm trivialized the importance of the *Miranda* rights by saying "these are just some rights that everyone is entitled to" and that he gives them to "99% of the kiddos in [his] office." We agree with Samuel that some of Detective Wilhelm's statements were not the picture of clarity, and perhaps too casual given the gravity of the situation. Even so, Samuel was provided with the substance of the *Miranda* warnings both orally and in writing, and Samuel repeatedly showed that he understood his rights. Like the detective's comments in *Doe I*, that called the Miranda warnings "this little piece of paper" and his comment that "[y]ou're going to have to answer some questions," Detective Wilhelm's inartful statements were not fatal to Samuel's *Miranda* waiver.

Samuel also claims that he was in a horrible mental and physical state during the interrogation, thereby rendering him incompetent and his waiver ineffective. Yet Samuel told the officers that he got "good enough" sleep the night before, throughout the interrogation Samuel was provided with water, and after about three hours he was given pizza. Samuel did not eat the pizza and told the officers that he wasn't hungry. Samuel appeared calm and engaged in the conversation and was allowed to go to the bathroom twice during the interrogation.

Samuel also asserts that although the officers acted as though they were on Samuel's side, he did not have the help of a "friendly adult" during his interrogation. First, we note that a juvenile's "access to a parent or other support adult" is a factor evaluated when assessing the voluntariness of a juvenile's confession, not whether the juvenile has voluntarily waived *Miranda* rights. *State v. Doe*, 130 Idaho 811, 817, 948 P.2d 166, 172 (Ct. App. 1997). Even so, Samuel was not accompanied by a parent or any other adult because Samuel's father had been killed earlier that evening, and the officers did not know how or where to contact Samuel's

20

mother during the interrogation. Indeed, when the officers asked Samuel for his mother's information, he did not know her phone number, was not sure how to spell her last name, and was not sure what city she lived in. The attorney who ultimately became Samuel's defense attorney tried to see Samuel during the interrogation but was denied access; however, Samuel admitted there was no prior attorney-client relationship. Thus, there was no supportive adult in Samuel's life to which the officers could have reached-out during this interview.

Lastly, Samuel alleges that his age, immaturity, and lack of education amplified the deficiency of the warnings and the coercive force of the officers' tactics. At the time of the interrogation Samuel was 14-years and 8 months old, and the evidence showed he was able to work independently on schoolwork and had no trouble communicating. Samuel was in the eighth grade and, although he was often absent from school, one of his teachers testified they were "amazed" at his ability to catch up.

Ultimately, based on the totality of the evidence, the trial court properly found that Samuel was at least of average intelligence, particularly for written and oral communication. Samuel has failed to show how Detective Wilhelm's warnings were misleading or that he did not understand them when he signed the waiver. The district court correctly considered the totality of the circumstances and concluded that Samuel's waiver of his *Miranda* rights was valid.

### 2. Samuel's confession was given voluntarily.

Samuel next argues that, for many of the same reasons that his *Miranda* rights were not voluntarily waived, Samuel's statements to the police were not voluntarily given. At the very least, Samuel alleges that his statements were coerced at the point in the interview when Samuel reluctantly admitted that he—and not his father—had killed his brother.

To determine whether a confession is voluntary, the Court looks to the "'totality of the circumstances'" to determine "whether the defendant's will was overborne." *Doe I*, 137 Idaho 519, 523, 50 P.3d 1014, 1018 (2002) (quoting *State v. Radford*, 134 Idaho 187, 191, 998 P.2d 80, 84 (2000)). Generally, these factors must be considered in determining whether a confession was given voluntarily:

> (1) Whether *Miranda* warnings were given; (2) The youth of the accused; (3) The accused's level of education or low intelligence; (4) The length of detention; (5) The repeated and prolonged nature of the questioning; and (6) Deprivation of food or sleep.

21

*Doe I*, 137 Idaho at 523, 50 P.3d at 1018 (citing *State v. Troy*, 124 Idaho 211, 214, 858 P.2d 750, 753 (1993)). The Idaho Court of Appeals has stated that in evaluating the voluntariness of a juvenile's confession, consideration must be given to "the child's age, maturity, intelligence, education, experience with police and access to a parent or other supportive adult." *Doe II*, 131 Idaho at 713, 963 P.2d at 396. "If the defendant's free will is undermined by threats or through direct or implied promises, then the statement is not voluntary and is inadmissible." *State v. Fabeny*, 132 Idaho 917, 922–23, 980 P.2d 581, 586–87 (Ct. App. 1999) (internal citation omitted).

For the first two hours of the interrogation the officers asked questions without challenging Samuel's answers, and Samuel maintained that his father had killed his brother. (Q: "Your dad shot [your brother]?" Samuel: "Yeah"); ("my brother, he . . . my dad killed him"); ("I didn't shoot my brother. My dad did."). Yet the officers later expressed their reservations about Samuel's version of the events:

> Detective Wilhelm: Okay, let's do this. Listen, we, you've been really helpful and you've been honest about everything we've talked about.
>
> Samuel: (Nodding head yes)
>
> Detective Wilhelm: [redacted]
>
> Samuel: Yeah.
>
> Detective Wilhelm: And for the most part, um, I think you're being honest, and-and you're the only one that knows. You were there. Correct?
>
> Samuel: Yeah.
>
> Detective Wilhelm: There is no way that your dad drug a shotgun and had a machete with him, and then you had a pistol. There's no way that all that happened. What really happened with your brother? Just tell me.
>
> Samuel: What do you mean, like . . .
>
> Detective Wilhelm: Listen, listen.
>
> Samuel: Pistol. I don't know where the 9MM is.
>
> Detective Wilhelm: Listen, we're super good at our jobs, okay? We're good at gathering evidence, putting pieces together like a puzzle. That's why they call them detectives because they detect things. So, we're gonna figure it all out. So I just need you to be honest and tell me how did your brother get shot? Not some story about a shotgun and a hatchet and all that other crap. The real story with your brother. What happened?
>
> Sergeant McCormick: (Reenters room).

22

Samuel: With my brother.

Detective Wilhelm: Yeah, just tell me. You're gonna feel better when you tell me. I don't want to hear you – it doesn't make any sense, to be perfectly honest, in detail about certain thing [sic] and then kind of, well, your dad and he had a machete and a shotgun and there's a 9MM floating around while he's shot in the belly crawling around. No way that happened. So, how did your brother get shot?

Samuel: I pushed the curtains, over.

Detective Wilhelm: Okay.

Samuel: I had the machete and I just stuck it on the wall. I said, "Com [sic] on get out." He wouldn't get out.

Detective Wilhelm: Okay.

Samuel: I just cut him.

Samuel then continued to explain how he cut his brother with the machete, leading to the following exchange:

Detective Wilhelm: Okay. You're tracking right because we went from your dad was dragging all this stuff around, and then you just threw the machete at him, "hey, save yourself," which was a total crap story and we admitted that, so now we're getting to the truth of what happened.

Samuel: (Sighs) my dad, he hit me.

Detective Wilhelm: Okay.

Samuel: I shot him.

Detective Wilhelm: Okay.

Samuel: I shot him three more times in the head.

Detective Wilhelm: Okay.

Sergeant McCormick: Was that all one right after the other? You shot him in the belly, three times in the head right after each other? Is that how that worked?

Samuel: I don't know.

Sergeant McCormick: Well, did he crawl up the hallway like you said earlier? It sounds like that's . . .

Samuel: Yeah.

Sergeant McCormick: He did crawl up the hallway?

Samuel: Yeah. After I shot him once he-he went in [my brother's] room.

Detective Wilhelm: Now remember, now just listen real quick. Sorry to interrupt Sarge, but, so like I said, these guys are-are experts in what they do, so we're gonna figure out this story anyway whether you give us the right story or not. But

it's gonna, it's gonna help you. You're gonna feel better. And it's gonna help me to kind of help you if you tell me the right story.

Samuel: Okay.

Detective Wilhelm: And-and you've been good with one part of the story I can get. That's how I can figure out that you're not being honest about this. So, so no more crap and no more leaving out details, so no more lies, so answer-answer his questions, okay?

In reviewing all relevant factors we conclude that Samuel's confession was voluntary. First, Samuel had been given *Miranda* warnings based on his receipt of the *Miranda* waiver form and his conversation with Detective Wilhelm in which Samuel stated affirmatively that he understood each of his rights. Second, at the time of the interrogation Samuel was 14-years and 8 months old, and evidence showed that he was able to work independently on schoolwork and had no trouble communicating. Samuel was in eighth grade and, although he was often absent from school, after observing the interrogation video, there was sufficient evidence to support the trial court's finding that Samuel is at least of average intelligence, particularly for written and oral communication.

The total time from Samuel's arrival at the police station to the conclusion of the interrogation was about five hours. Samuel was given several breaks during the interrogation and was allowed to use the bathroom. Throughout the interrogation Samuel was provided with water, and a little more than halfway through he was given pizza. Further, while Detective Wilhelm and Sergeant McCormick repeated some of the same questions this appears to have been done in an effort to obtain honest answers and clarify the sequence of events.

The district court ultimately concluded:

> Based upon the [c]ourt's thorough observation of the interrogation video . . . the officers were polite and considerate of [Samuel], that the officers respected [Samuel's] personal space, and that overall the interrogation tactics employed did not overbear [Samuel's] will. The [c]ourt specifically notes [Samuel's] confirmation that he had not been threatened in any way. . . .

> Finally, in evaluating the totality of the circumstances, the [c]ourt finds that [Samuel's] will was not overborne by Detective Wilhelm's statements that [Samuel] would feel better if he was honest, and that honest [sic] would help him to help [Samuel]. The [c]ourt finds that overall, the factors in [Samuel's] case are similar to the factors in *Doe I* and *Doe II*, both cases where confessions were not suppressed.

We hold that the district court properly considered the requisite factors and did not err when it determined that Samuel's confession was voluntary. Samuel has failed to show that the district court erred by denying his motion to suppress.

**C.      The district court did not abuse its discretion when it barred Samuel from presenting some evidence of specific instances of Samuel's father's violent and irrational behavior.**

The defense theory presented at trial was that Samuel killed his father in self-defense, and that he killed his brother in a rage—thereby committing manslaughter, not murder. On January 15, 2016, five days into trial, the State moved to exclude evidence and testimony about specific instances of Samuel's father's conduct before the night of the murders. Samuel's defense counsel objected to the State's motion, and argued that evidence of specific instances of his father's violence and drug use were not precluded by IRE 404 and 405, that Samuel had a constitutional right to present evidence in support of his justifiable homicide defense, and that the authorities relied on by the State were not controlling.

Shortly thereafter, the district court held that any evidence about specific instances of conduct would not be admissible to show character traits:

> THE COURT: I agree with you, [defense counsel], your client has the right to put on a defense, but that right is subject to the application of case law of this state, the 9th Circuit as it may apply, the U.S. Supreme Court. It's also subject to the Rules of Evidence, and while I agree with you that under 404(a)(2) that evidence of a character trait of a victim may come in, it comes in as a pertinent trait of character, not specific instances, and that's made exceptionally clear when one looks at 405. 404 talks about character evidence not generally being admissible. It lists exceptions under two. Then you go to 405(a), "Reputation or opinion. In all cases in which evidence of character of a trait or character of a person is permissible, proof may be made by testimony as to reputation or opinion regarding a propensity of the individual." It does not allow inquiring into specific instances. The case law is very clear on that.
>
> Some of the decisions that you cited in your objection dealt with 404(b) which is a completely different issue. That's prior bad acts. That requires notice. It requires some other considerations. So the Court is looking at the character of the evidence and how it might come in.
>
> I'm also looking at the pretrial order. It wasn't clear to me how you were going to tender this evidence until the opening statement either. Once it became clear, that raised the same concerns in my mind as it did with [the prosecutor].
>
> The State's motion is granted to exclude evidence of specific instances of conduct relevant to proving the propensity of [Samuel's father], for violence,

25

quarrelsomeness, drug addiction or other specific issues. You can still get it in through reputation or opinion, but you're going to have to lay an appropriate foundation that any witness that you use for that purpose has a sufficient foundation to offer a credible opinion, specifically the Court is going to order that there are to be no questions propounded regarding specific instances of [Samuel's father] or [Samuel's brother's] conduct prior to the evening of March 24th in the presence of the jury. If something comes up as we go through this – and that's from the defense. If the State wants to go into those specific instances, it may do so. I doubt they will.

In effect, the defendant in this case has already been allowed to testify as to some of those specific instances through the admission of his interrogation tape, so that went farther than he probably – than he might have been allowed to go under the Rules of Evidence. If you feel a burning need to go outside of that order, [defense counsel], or [other defense counsel], do it outside the presence of the jury.

Samuel contends that the district court erred and abused its discretion by precluding Samuel from presenting *any* evidence of specific instances of his father's past violent and irrational behavior, including those that Samuel personally experienced. Samuel argues that specific instances of his father's irrational and violent behavior that were known to Samuel, were admissible under I.R.E. 404(b) for the jury's consideration of whether he feared his father, and whether that fear was reasonable.

In response, the State provides numerous citations to the trial record where the district court permitted Samuel to introduce evidence about his father's violent reputation and character, as well as his drug use. The State argues that the district court properly excluded specific instances of Samuel's father's misconduct, but permitted Samuel to introduce general evidence of his father's character traits instead.

"The trial court's judgment concerning admission of evidence shall only be disturbed on appeal when there has been a clear abuse of discretion." *State v. Perry*, 150 Idaho 209, 218, 245 P.3d 961, 970 (2010) (internal quotation omitted). Under this standard the Court asks whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason. *Lunneborg v. My Fun Life,* 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

Generally, evidence that has any tendency to make a fact more or less probable than it would be without the evidence is admissible at trial. I.R.E. 401(a). However, Idaho Rule of

26

Evidence 404(a) prohibits the introduction of character evidence to prove that on a particular occasion the person acted in accordance with the trait. Even so, a defendant may offer evidence of an alleged victim's pertinent trait of character and the prosecutor may offer evidence to rebut it. I.R.E. 404(a)(2)(B). "Idaho Rule of Evidence 405 provides that character evidence may usually be admitted only as testimony in the form of an opinion or testimony as to reputation, but on *cross-examination*, a party may inquire about relevant *specific instances* of conduct." *State v. Ormesher*, 154 Idaho 221, 225, 296 P.3d 427, 431 (Ct. App. 2012) (emphasis in original).

### 1. Admissibility of specific instances under Rule 404(b)

First, Samuel argues that evidence supporting Samuel's claim that he feared his father, and evidence supporting a finding that Samuel's fear was objectively reasonable, was relevant to his justifiable homicide defense and thus admissible under Idaho Rules of Evidence 401 and 402. Samuel maintains that the district court abused its discretion by failing to apply Idaho Rule of Evidence 404(b) to allow the jury to consider specific instances of Samuel's father's irrational and violent behavior to help determine whether Samuel had a reasonable fear of his father.

Under Rule 404(b) "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

> In determining the admissibility of evidence of prior bad acts under Rule 404(b), this Court applies a two-prong analysis. First, the evidence must be relevant to a material and disputed issue concerning the crime charged. Whether evidence is relevant is an issue of law. Therefore, when considering a district court's admission of evidence of prior misconduct, we exercise free review of the trial court's relevancy determination. The second step in the analysis is the determination that the probative value of the evidence is outweighed by unfair prejudice. A court's decision that evidence is more probative than prejudicial is reviewed for abuse of discretion.

*State v. Custodio*, 136 Idaho 197, 205, 30 P.3d 975, 983 (Ct. App. 2001) (internal citations omitted).

Here, the specific instances of Samuel's father's violent and irrational behavior would be relevant to helping determine whether Samuel had a reasonable fear of his father. Even so, allowing an inordinate amount of that evidence could be unfairly prejudicial. Thus, the

unfairness would stem as much from the cumulative nature of the evidence, as from its possible violation of Rule 404(b). While the district court excluded some of this evidence under Rule 404(b), it also cited to the cumulative nature of this testimony based on Samuel's interview. We affirm without addressing the 404(b) question because, as the State noted, much of this evidence was admitted and allowing additional specific instances of conduct to be admitted would have been cumulative, thus violating I.R.E. 403. The record is replete with evidence regarding specific instances of Samuel's father's violent conduct, whether from Samuel's interview, or from Dr. Beaver. As such, the district court did not abuse its discretion in limiting evidence and testimony about specific prior instances of Samuel's father's conduct.

### 2. *Admissibility of specific instances under Rules 702 and 703*

Next, Samuel contends that he should have been permitted to introduce expert testimony that would include references to Samuel's father's violent behavior because he raised a mens rea defense under Idaho Code section 18-207.

> Idaho Code § 18-207 does not remove the element of criminal responsibility for the crime. The prosecution is still required to prove beyond a reasonable doubt that a defendant had the mental capacity to form the necessary intent. Idaho Code § 18-207 merely disallows mental condition from providing a complete defense to the crime and may allow the conviction of persons who may be insane by some former insanity test or medical standard, but who nevertheless have the ability to form intent and to control their actions. The statute expressly allows admission of expert evidence on the issues of mens rea or any state of mind which is an element of the crime.

*State v. Card*, 121 Idaho 425, 430, 825 P.2d 1081, 1086 (1991).

Before trial, Samuel disclosed Dr. Beaver and Dr. Gentile as expert witnesses. Dr. Beaver had opined in his report that Samuel "lacked the capacity to form the deliberate intention of taking his father's and his brother's lives with malice aforethought" largely because of Samuel's history of facing his father's irrational and violent behavior. Dr. Gentile opined in his report that Samuel had not premeditated or planned the killings, but that "[o]nce he was provoked and felt threatened enough to pull the trigger, there was no stopping because of how the teenage brain works and how he had been conditioned by his father to be ready to defend himself from threats." On the tenth day of trial the State moved to limit the testimony of Dr. Beaver and Dr. Gentile by excluding any statements about specific instances of Samuel's father's conduct.

28

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. I.R.E. 702. Rule 703 provides that facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. I.R.E. 703.

Samuel argues that by its plain language Rule 703 contemplates that facts or data that might not otherwise be admissible may be admitted if the probative value in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect. Even so, it is well-established that an expert witness may not "serv[e] as a conduit for the introduction of otherwise inadmissible evidence." *State v. Watkins*, 148 Idaho 418, 427, 224 P.3d 485, 494 (2009). The district court thus did not abuse its discretion in precluding Dr. Beaver and Dr. Gentile from testifying about Samuel's father's specific prior acts. Further, despite the district court's ruling, Dr. Beaver did testify to specific instances of Samuel's father's violence several times. For example, Dr. Beaver testified that Samuel's father was very violent with Samuel and that he "punched him, hit him, beat him with hangers so he couldn't go to school because of marks on his feet and legs." Dr. Beaver also testified that Samuel's father would go into rages and break Samuel's belongings, including jars filled with things Samuel had collected or a Lego creation Samuel was proud of. This testimony went beyond the district court's order and gave the jury some of the evidence Samuel now argues should have gone to the jury without restriction.

### 3. Whether Samuel was deprived of his right to present a defense.

Samuel also claims that the district court's ruling prohibiting him from introducing evidence of his father's specific conduct deprived him of his right to present a defense. In rendering its decision the district court agreed that Samuel had the right to put on a defense, but stated "that right is subject to the application of case law of this state, the 9th Circuit as it may apply, the U.S. Supreme Court. It's also subject to the Rules of Evidence."

Indeed, this Court has recognized:

> A defendant's Sixth Amendment right to present evidence is fundamental; however, this right is subject to reasonable limitations. The exclusion of evidence does not impair the defendant's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they serve. The exclusion is

29

unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused. With the exercise of the defendant's right to present evidence, the rules of procedure and evidence must be complied with to assure both fairness and reliability in the ascertainment of guilt or innocence.

*State v. Perry*, 139 Idaho 520, 523, 81 P.3d 1230, 1233 (2003) (internal citations and quotations omitted).

In *State v. Dallas*, the defendant was convicted of voluntary manslaughter for shooting two Fish and Game conservation officers. 109 Idaho 670, 671, 710 P.2d 580, 581 (1985). The defendant argued that he shot them in self-defense, and at trial he sought to introduce evidence of specific acts by the victims that would show a tendency towards aggressive behavior. *Id*. at 678, 710 P.2d at 588. The trial court allowed the defendant to introduce evidence of specific conduct related to one of the victims. *Id*. at 679, 710 P.2d at 589. After he was convicted, the defendant appealed and argued the trial court erred when it restricted his ability to present specific instances of both victims' violent conduct in support of his self-defense claim. *Id*. This Court held "that Idaho law did not permit the accused to introduce evidence of specific instances of the victim's prior conduct in order to support an inference that the victim was the first aggressor." *Id*. The Court continued:

The reason for this prohibition is that evidence of specific instances of the victim's conduct, while probative, tends to be highly prejudicial. . . . The bad character of the deceased is likely to be thought of by the jury as an excuse for the killing. Learning of the victim's bad character could lead the jury to conclude that the victim merely "got what he deserved" and to acquit for that reason. Accordingly, the majority view is to disallow such evidence.

*Id*. Consistent with *Dallas*, we hold that the district court's exclusion of specific instances of Samuel's father's conduct did not infringe on Samuel's right to present a defense.

> 4. *Whether the State opened the door to specific conduct evidence because Samuel discussed specific instances in his police interview.*

Lastly, Samuel asserts that the State opened the door to evidence of specific instances of Samuel's father's past conduct by introducing Samuel's interrogation video in which Samuel made references to those specific instances. Indeed, during his interrogation Samuel told the officers that his father was on medication that made him "do stupid things," that his father would beat him, that his father believed in the "zombie apocalypse," and that his father ran over his mother with his car. Samuel now argues that by denying him the ability to present additional

evidence of specific instances of his father's irrational and violent behavior the district court deprived him of the ability to present corroborating evidence for his statements.

That said, even where a trial court has admitted relevant evidence, it may limit the extent to which a jury may use that evidence. *State v. Parmer*, 147 Idaho 210, 216, 207 P.3d 186, 192 (Ct. App. 2009). Here, the district court gave a limiting jury instruction for just such a purpose:

INSTRUCTION NO. 35

> Evidence has been admitted concerning the reputation of [Samuel's father], for being quarrelsome, violent and dangerous. You may consider this evidence only for the limited purpose of making your determination as to the reasonableness of the defendant, [Samuel's] beliefs under the circumstances then apparent to him, but only if he was aware of such reputation.

The district court did not abuse its discretion in permitting Samuel to introduce general evidence of his father's violent character and drug use while also excluding evidence of prior specific acts. By presenting the interrogation video, the State did not open the door into specific misdeeds in Samuel's father's past. The district court properly exercised its discretion in limiting the extent of this evidence, without violating Samuel's right to present a defense.

**D.     The district court abused its discretion when it did not allow Samuel's mother to testify about Samuel's fear of his father, but that error is ultimately harmless.**

At trial, defense counsel asked Samuel's mother "[d]id you ever see if [Samuel] was afraid of his father?" The State objected on relevance grounds, and the district court ruled:

> I'm going to sustain the objection, and I'm doing it based upon the fact that there is already independent evidence in the record of his fear of his father. The answer would be more prejudicial than probative, so I'm going to exclude the line of questioning.

Samuel argues that the district court abused its discretion in sustaining the State's objection to Samuel's mother's testimony because it was not based in reason and it was inconsistent with applicable legal principles. Samuel states that the only other "independent evidence" of Samuel's fear of his father came in through his interrogation video, which Samuel maintains is inadmissible. Samuel admits that his mother's testimony corroborating his claims that he feared his father would be prejudicial to the State's case, but argues that it would not be "unduly prejudicial."

The State counters that the district court correctly determined that the prejudicial effect of Samuel's mother's testimony outweighed its probative value. The State claims that Samuel's mother left in 2012, and her testimony about Samuel's fear of his father, years before the

31

murders, would have had limited probative value. The State also highlights that along with Samuel's interrogation video, other witnesses testified about Samuel's father's violence towards him; specifically, Dr. Beaver testified "that Samuel felt like his life was in danger from his father and that he was fearful of his father because his father would beat him and point guns at his mother." Even so, Dr. Beaver did not testify until six days after the district court made its ruling excluding Samuel's mother's testimony; therefore, the court could not have considered Dr. Beaver's testimony when determining whether the probative value of his mother's testimony was outweighed by its prejudicial impact. Additionally, aside from Dr. Beaver, the State does not clarify what other witnesses testified about Samuel's father's violence.

This Court reviews questions about the admissibility of evidence using a mixed standard of review. *State v. Ehrlick*, 158 Idaho 900, 907, 354 P.3d 462, 469 (2015) (citing *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008)). Whether evidence is relevant is a matter of law that is subject to free review. *Id.* (citing *State v. Field*, 144 Idaho 559, 569, 165 P.3d 273, 283 (2007)). A district court's determination of whether the probative value of the evidence outweighs its prejudicial effect is reviewed for an abuse of discretion. *Id.* (citing *Stevens*, 146 Idaho at 143, 191 P.3d at 221). The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. I.R.E. 403.

The district court sustained the State's objection to Samuel's mother testifying about Samuel's fear of his father "based upon the fact that there is already independent evidence in the record of his fear of his father." Thus, the district court considered this evidence somehow cumulative, and thus overly prejudicial based on other evidence in the record about Samuel's fear of his father. The only evidence we are aware of at that point in the trial was Samuel's confession. As a result, the court held that testimony would be "more prejudicial than probative" and excluded the line of questioning. That said, the district court did not suggest what "independent evidence" it was referring to. This Court has held that a district court's exclusion of evidence without identifying the support for a Rule 403 analysis constituted an abuse of discretion. *State v. Parker*, 157 Idaho 132, 139, 334 P.3d 806, 813 (2014); *State v. Ruiz*, 150 Idaho 469, 471, 248 P.3d 720, 722 (2010). Simply stating that the probative value is outweighed

by unfair prejudice is insufficient. We therefore hold that the district court abused its discretion in excluding the evidence based on its failure to identify support for its Rule 403 analysis. [2]

Even so, the district court's decision is harmless. "Where the defendant meets his initial burden of showing that a violation occurred, the State then has the burden of demonstrating to the appellate court beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict." *State v. Perry*, 150 Idaho 209, 227, 245 P.3d 961, 979 (2010). While Dr. Beaver's testimony was not before the district court when it rendered its decision excluding Samuel's mother's testimony, the jury did have it to consider before deliberations. Dr. Beaver testified that Samuel's father was very violent with Samuel, punched him, hit him, and beat him with hangers. Dr. Beaver also testified that Samuel felt like his life was in danger from his father and he was fearful of his father because he would point guns at his mother. Thus, even without Samuel's mother's testimony, we hold that there was evidence for the jury to consider that showed Samuel was afraid of his father.

E.    **The district court did not abuse its discretion when it limited Dr. Gentile's testimony.**

Before trial, Samuel's counsel disclosed Douglas Gentile, Ph.D., as an expert witness. Dr. Gentile is a professor of child psychology and a researcher on the effects of media violence of juveniles. In his report, Dr. Gentile concluded:

> [I]t is my expert opinion that [Samuel] committed these acts, but not because he intended to or had planned them. Once he was provoked and felt threatened enough to pull the trigger, there was no stopping because of how the teenage brain works and how he had been conditioned by his father to be ready to defend himself from threats.

Ten days into the trial, the State moved to limit Dr. Gentile's testimony because he was not a licensed psychologist; his report made several factual determinations that were within the jury's fact-finding responsibilities; and he introduced evidence of specific instances of conduct relating to Samuel's father. The State asked the court to limit Dr. Gentile's testimony to general risk factors he found to exist for Samuel based on his review of records, and the resulting risk of aggression. Ultimately, the district court held:

---

[2] We recognize that the court likely was circumspect while making this evidentiary ruling in front of the jury. Even so, the better practice is to identify clearly the evidence the court relies on in making Rule 403 balancing determinations, even if the jury must excused for a few minutes to do so.

I've reviewed the documents we're talking about at length, and the [c]ourt concludes that the area of expertise for the doctor is – Dr. Gentile is in the area of neuroscience as it relates to risk factors for violence as they may be tied to violent movies, video games, environmental factors . . . .

Outside the presence of the jury, the district court went through Dr. Gentile's report and ruled on the State's specific objections before concluding:

Just so that we're clear, it's the [c]ourt's finding that Dr. Gentile can talk generally about his research, the risk factors he identifies in general for violence in adolescents. He can talk about how adolescents with those kinds of risk factors are likely to respond in violent fashion, but it's not to be tied to this case because he's not qualified as an expert as a licensed psychologist. That rests also on the definition of the practice of psychology which includes application of established principles of learning, motivation, perception, thinking and emotional relationships to specific instances – or specific circumstances in cases.

Consistent with the district court's ruling, Dr. Gentile testified generally about brain development, a typical 14-year-old boy's brain functioning, and risk factors for violence, but did not inform the jury of his opinion that Samuel did not pre-plan or consider what he was doing when he killed his father and brother.

Samuel argues that the district court abused its discretion in limiting Dr. Gentile's testimony and preventing him from applying his expertise to the facts of the case. Samuel asserts that the district court's ruling rests on two things: (1) only Idaho licensed psychologists are qualified to apply their expertise to individuals while testifying at trial; and (2) experts are not allowed to testify about ultimate questions of fact. Samuel concludes that Dr. Gentile proffered an opinion on whether Samuel acted with malice aforethought, an opinion on an ultimate question of fact specifically authorized by Idaho Code section 18-207 and Idaho Rule of Evidence 704.

The State responds that Samuel provided no foundational evidence that Dr. Gentile was qualified to diagnose or opine about Samuel's intent on the night of the murders. The State concedes that Dr. Gentile was a highly qualified researcher and academic regarding media violence on juveniles, but argues that Samuel presented no evidence that he was qualified to diagnose Samuel; as such, it was appropriate for the district court to limit Dr. Gentile's testimony. The State argues that even if the district court erred in limiting Dr. Gentile's testimony, that error was harmless because Dr. Beaver, who is a qualified psychologist, testified that Samuel lacked the requisite intent.

34

"A district court has broad discretion in determining whether a witness is qualified as an expert." *State v. Herrera*, 164 Idaho 261, 272, 429 P.3d 149, 160 (2018), reh'g denied (Nov. 13, 2018) (quoting *Weeks v. E. Idaho Health Servs.*, 143 Idaho 834, 837, 153 P.3d 1180, 1183 (2007)). A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. I.R.E. 702. "Formal training is not necessary, but practical experience or special knowledge must be shown to bring a witness within the category of an expert." *Herrera*, 164 Idaho at 272, 429 P.3d at 160. Under Rule 702, "the proponent of the testimony must lay foundational evidence showing that the individual is qualified as an expert on the topic about which he or she will testify." *State v. Burrow*, 142 Idaho 328, 330, 127 P.3d 231, 233 (Ct. App. 2005).

Contrary to Samuel's arguments, the district court did not preclude Dr. Gentile's testimony only because he is not licensed in Idaho. Instead, it is the fact that Dr. Gentile is not a licensed psychologist at all that is the basis of its ruling. As a result, Dr. Gentile is not qualified to diagnose mental or emotional disorders. The district court found that Dr. Gentile was an expert "in the area of neuroscience as it relates to risk factors for violence as they may be tied to violent movies, video games, environmental factors . . . ." Samuel did not lay the foundational evidence that Dr. Gentile was qualified to diagnose Samuel or provide an opinion about his intent. We hold that the district court did not abuse its discretion in limiting Dr. Gentile's testimony.

Further, Dr. Beaver, who is a licensed psychologist, provided the following testimony that is consistent with the testimony Dr. Gentile would have proffered:

Q:    Let's first talk about your opinion whether [Samuel] on that night had the sufficient capacity to appreciate the character and quality of his acts.

A:    Well, first of all, any time that we go to reflect upon our actions or activities, it is based on many pieces. One piece of course is what our life experience has been up to that point. That helps us make decisions about what we think is going to happen, what is appropriate, what is inappropriate.

In this case you have somebody that has a history of being traumatized and abused. You have him constantly being exposed to violence, whether it's video games, whether it's the movies, so he's in that circumstance. He knows this is a high-risk time because his dad's quite impaired. History has been that when his dad is impaired like that, he's gonna get a beating or worse. His dad's firing off a

35

handgun. He takes that from him, and it is within that context that his dad, as [Samuel] has described, punches him several times in the chest confronting him. It's within that context that the gun gets fired.

In my opinion he lacked the ability at that time to understand what he was doing or to weigh or contemplate what was going on at that moment. He was reacting to a very threatening situation.

\*\*\*\*

Q. One of the issues in this case . . . is that he committed premeditated murder of his brother. Do you have an opinion of whether [Samuel] was capable at that time of premeditating, weighing the pros and cons of whether he should or should not kill his brother?

. . . .

A. After the shooting of his father, [sic] my opinion [Samuel] was in a very highly-charged emotional state. In talking with him, he talks about feeling as if he's outside of his body, watching what is going on. He doesn't talk about reflecting about what's happening. In that regard, I don't think that he had the capacity to form the intent and to weigh what his actions were going to be. Again, I think he was reacting at that time.

\*\*\*\*

Q. One of the elements of first degree murder . . . is that it was a deliberate, premeditated murder, and deliberate doesn't mean on purpose. It means deliberate like the jury will do, weigh the pros and cons before reaching a decision. Do you have an opinion of whether he was capable at that time of deliberating whether he should or should not kill his brother?

. . . .

A. In my opinion he wasn't capable of deliberating as we think of it. Again, I think he was reacting. He was reacting within the context of what he had been through in terms of the violence that he had lived through and been involved with. The only reason that I am hesitant at all about part of the deliberate part is that it is my opinion that his beliefs in the zombie apocalypse had some impact on some of the things that happened that night.

This testimony was much like the testimony Dr. Gentile was precluded from offering. Thus, even if the ruling were in error, Samuel would have suffered no prejudice in the district court's precluding Dr. Gentile from offering a direct opinion about Samuel's intent. Dr. Gentile's testimony was merely cumulative.

**F.    The district court did not abuse its discretion when it excluded Dr. Julien's expert opinions about Samuel's intoxication from Celexa.**

36

During trial, the defense tried to introduce testimony from Dr. Robert Michael Julien about Samuel's intoxication from Celexa, a medication prescribed to his father. Dr. Julien has a Ph.D. in pharmacology, with a subspecialty in a field called psychopharmacology which studies the effects of how drugs affect the brain and behavior.

Dr. Julien testified that Samuel's father was prescribed Soma, Ambien, Celexa, Hydrocodone, Lorazepam, and Alprazolam; however, the toxicology report drawn during Samuel's father's autopsy revealed that he had Celexa, Ambien, Bendaryl, and Hydrcodone, in his blood. Dr. Julien also testified that Samuel's father had a "blackout level" of Ambien in his blood.

Next, Dr. Julien testified that Samuel was prescribed Lorazepam, also known as Ativan or Ambien. When testifying about Samuel's toxicology report, Dr. Julien stated that Samuel never had his blood drawn; instead, a hair sample was taken three weeks after the night of the murders. Dr. Julien explained that a hair sample does not show the quantity of drug usage but it shows chronic use. Dr. Julien testified that Samuel's hair sample contained Benadryl and Celexa. On the day of the murders, Samuel was also prescribed Prozac, but Dr. Julien testified there was no indication in the hair sample that Samuel had taken any. In making this statement Dr. Julien also specified that a hair sample would not have been sensitive enough to pick up a single dose of Prozac even if he had taken it that day.

Dr. Julien opined that because Samuel did not have evidence of his prescribed drugs in his hair, and was not prescribed Celexa, "probably those drugs had been taken by another person and replaced with the Celexa." Dr. Julien testified that Prozac and Celexa were both SSRIs, which elevate serotonin levels in the brain. High levels of serotonin can cause "serotonin syndrome," which can cause muscular problems, anxiety, restlessness, agitation, delirium, and hallucinations. The following exchange then took place:

> DEFENSE COUNSEL: Now, based on your education, training and experience and your review of these records, I'm going to ask you your opinion regarding whether [Samuel] would've had the ability to formulate a specific intent to kill. In your opinion would he have been?
>
> PROSECUTOR: Objection. I'm going to object to foundation. It's outside the scope of his opinion and –
>
> THE COURT: Sustained as to lack of foundation.
>
> DEFENSE COUNSEL: Pardon me.

DEFENSE COUNSEL: Did you form an opinion as to whether, given his state of medication/drugs that night that we're aware of, if he would've been able to formulate a specific intent to kill?

PROSECUTOR: I'm going to object, Your Honor. Can we approach?

THE COURT: You may.

(Discussion at the bench off the record)

DEFENSE COUNSEL: What is the effect of SSRI – of the SSRI on [Samuel's] cognitive abilities?

A. If the dose was significantly high, and we do not know because no blood sample was drawn, I would expect to see some cognitive –

PROSECUTOR: I'm going to object, Your Honor, to him speculating as to what the effect would be.

THE COURT: Sustained. There's no evidence as what the level was.

DEFENSE COUNSEL: Doctor, what about the behaviors that [Samuel] displayed during the killings? What where those and how do they apply here?

THE PROSECUTOR: Your Honor, I'm going to object. Could I ask a couple of questions in aid?

THE COURT: Why don't we excuse the jury a minute and let's explore it? Please remember the admonition.

During questioning outside the presence of the jury, Dr. Julien admitted that he was not positive that Samuel had the drug in his bloodstream at the moment of the incident. Dr. Julien stated "[i]t could be it wasn't given to him that day, but he still had been receiving it long enough over a long enough period of time that it was present in hair samples." When Dr. Julien was asked about his report that stated that six pills from Samuel's father's Citalopram prescription were missing, "presumably administered to [Samuel]," Dr. Julien stated "[p]resumably that would be true, although without a blood sample we don't know for absolute certainty –."

The district court concluded:

THE COURT: All right. The Court's going to exclude any opinions of this witness based upon intoxication from Celexa because he only knows there was Celexa in his system at one point based upon the hearsay. He doesn't know if there was any in his system other than supposition on that particular day.

Further, I find he doesn't have the factual basis to tie any ultimate opinion regarding intoxication to specific conduct he's not aware of, so I'm going to exclude testimony regarding intoxication as to [Samuel].

Dr. Gentile then opined that from the pill counts and what had been presented at trial Samuel had an SSRI in his blood system that night. After considering the proffered testimony, the court

38

ruled, "I'm still going to exclude it because it's based upon supposition: the pill count and the dates. Its probative value is diminished by those facts. The risk of prejudice is high."

Samuel argues that the district court did not act consistently with the applicable legal principles when it excluded Dr. Julien's expert opinion about Samuel's intoxication from Celexa. Samuel asserts Dr. Julien was qualified to testify as an expert on the presence of drugs and the effects of drugs in Samuel's system and that testimony would have helped the jury determine a fact in issue—Samuel's mental state.

The State argues that the district court did not abuse its discretion when it excluded the portion of Dr. Julien's testimony on Samuel's intoxication from Celexa because it was speculative. The State also maintains that even if it was an error, the error was harmless based on the other testimony at trial that Samuel did not have the intent to kill.

A district court's determination on the admissibility of expert testimony is reviewed for an abuse of discretion. *State v. Herrera*, 164 Idaho 261, 272, 429 P.3d 149, 160 (2018), reh'g denied (Nov. 13, 2018). A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. I.R.E. 702.

Samuel argues that there are four reasons that the district court's ruling is erroneous. First, Samuel asserts that the district court impermissibly excluded Dr. Julien's testimony based on hearsay when Idaho law is clear that an expert may base an opinion on "(1) facts within [her] personal knowledge; (2) facts presented to [her] at trial; or (3) facts presented to [her] outside of court, but not perceived by [her] personally, if those facts are the type of facts reasonably relied upon by experts in [her] field in drawing such conclusions." *State v. Stanfield*, 158 Idaho 327, 341, 347 P.3d 175, 189 (2015)). That said, the district court did not exclude Dr. Julien's testimony because it was based on hearsay; it correctly excluded Dr. Julien's testimony about Celexa intoxication because it was based on speculation. This Court has held that "[t]estimony is speculative when it theorizes about a matter as to which evidence is not sufficient for certain knowledge." *Adams v. State,* 158 Idaho 530, 538, 348 P.3d 145, 153 (2015). "An expert's opinion that is speculative or unsubstantiated by facts in the record is inadmissible because it would not assist the trier of fact." *State v. Caliz-Bautista*, 162 Idaho 833, 836, 405 P.3d 618, 621

(Ct. App. 2017) (citing *J-U-B Eng'rs, Inc. v. Sec. Ins. Co. of Hartford*, 146 Idaho 311, 316, 193 P.3d 858, 863 (2008)).

Samuel's second argument fails for the same reasons. Samuel alleges that Dr. Julien was drawing a reasonable inference that Samuel's father had given him some of his Celexa pills. Samuel alleges that whether to give credence to such an inference is a decision for the jury. Even so, Dr. Julien had to speculate that Samuel had Celexa in his bloodstream on the day of the murders and whether it was enough to cause intoxication. Such unreliable testimony was properly excluded.

Third, Samuel argues Dr. Julien had a sufficient knowledge of Samuel's conduct that night to draw an opinion about his intoxication because he reviewed the police report. Dr. Julien summarized the events that took place that evening:

> Well, very briefly, on March 24th of—first, [Samuel], was seen medically with some prescriptions offered that morning. Later in the day . . . the father, apparently was acting very intoxicated and, uh, weird, complex behaviors that I think have been offered to this court. He was running around the yard and at some point had fired a gun into the area – into the air. I understand that there was much involvement of zombie apocalypse with back door nailed shut, the windows covered, aggressive behaviors, a lot of fear of zombies for some reason. I understand that likely the deceased father returned into the house after firing the gun, and there was some interactions between he and [Samuel], resulting in [Samuel] shooting [his father], fatally, after which time he then fatally injured his younger brother.

However, none of this testimony addresses whether Dr. Julien knew that Celexa was in Samuel's blood stream that night or whether it could cause intoxication. The foundation for Dr. Julien's testimony was insufficient to support his testimony on this ground.

Fourth, Samuel asserts that any alleged prejudice of Dr. Julien's testimony would not have significantly outweighed its probative value. While this claim would require us to delve into the weight versus prejudice analysis of Rule 403, we will not get there. The district court did not abuse its discretion because it correctly determined that Dr. Julien's testimony about Celexa intoxication was too speculative. Simply put, because there was no blood draw there was no definitive way to know whether Samuel was intoxicated from Celexa on the night of the murders. Thus, the district court properly excluded this portion of Dr. Julien's testimony because it was based on supposition.

**G.  The cumulative error doctrine does not apply.**

Samuel admits that he killed both his father and brother. Even so, Samuel maintains that the district court erred when it allowed the jury to hear evidence supporting the State's theory that he acted with premeditation in killing his brother, and with malice aforethought in killing both, but in preventing the jury from hearing evidence that would dispute the State's theory. Samuel asserts that this accumulation of errors deprived him of his right to a fair trial. The State argues that even if there were errors in Samuel's trial, there is no reasonable possibility the verdict would have been different given the physical evidence.

"Under the cumulative errors doctrine, an accumulation of irregularities, each of which might be harmless in itself, may in the aggregate reveal the absence of a fair trial in contravention of the defendant's right to due process." *State v. Martinez*, 125 Idaho 445, 453, 872 P.2d 708, 716 (1994). That said, "[t]he presence of errors . . . does not by itself require the reversal of a conviction, since under due process a defendant is entitled to a fair trial, not an error-free trial." *State v. Parker*, 157 Idaho 132, 149, 334 P.3d 806, 823 (2014) (quoting *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998)). "[A] necessary predicate to the application of the doctrine is a finding of more than one error." *Id.* (quoting *State v. Perry*, 150 Idaho 209, 230, 245 P.3d 961, 982 (2008)).

The State's reliance on the overwhelming physical evidence here is less persuasive in light of Samuel's admission that he killed his father and brother. Rather, the primary issue relates to intent, which is not so easily identifiable through the physical evidence. All the same, the cumulative error doctrine does not apply because we have found only one error here - the exclusion of Samuel's mother's testimony, which was ultimately harmless.

## H.     The district court did not abuse its discretion in sentencing.

The jury found Samuel guilty of second degree murder for killing his father, and first degree murder for killing his brother. At the sentencing hearing, the district court listened to victim impact statements, expert testimony, and considered the evidence, before ultimately applying the *Toohill*[3] factors to sentence Samuel to a unified term of fifteen years, with ten years fixed, for second degree murder, and a concurrent life term, with twenty years fixed, for first degree murder.

---

[3] *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982).

On appeal, Samuel argues that the district court failed to appreciate Samuel's horrific childhood, age, and mental health issues when it imposed his sentence. Samuel also alleges that his accountability, remorse, and insight into his actions should mitigate his sentence. In response, the State argues that the court's primary consideration in sentencing is the good order and protection of society. The State emphasizes that the district court considered all the testimony and evidence, including testimony that Samuel was at a "high risk for reactive violence." The State concludes that the district court's concern over Samuel's violence and the need for long term treatment is well founded in the record, and the court did not abuse its discretion in crafting Samuel's sentence.

This Court reviews a district court's sentencing decision for an abuse of discretion. *State v. Strand*, 137 Idaho 457, 460, 50 P.3d 472, 475 (2002). "When a sentence is challenged as being excessively harsh, we independently review the record on appeal, having due regard for the nature of the offense, the character of the offender, and the protection of the public interest." *Id*. (citing *State v. Trevino*, 132 Idaho 888, 980 P.2d 552 (1999)). To show the sentence was unreasonable, "the defendant must show that the sentence, in light of the governing criteria, is excessive under any reasonable view of the facts." *Id*. The objectives of sentencing are well established in Idaho: (1) protection of society, (2) deterrence of the individual and the public generally, (3) possibility of rehabilitation, and (4) punishment or retribution for wrongdoing. *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982).

Samuel's first argument is that the district court did not properly consider his horrific childhood. Samuel argues that the chaotic and abusive environment he grew up in impacted his actions on the day of the murders. Specifically, Samuel alleges that the district court failed to properly consider mitigating evidence that he suffered from watching the physical and mental abuse his father inflicted on his mother, was neglected which led to poor hygiene and malnourishment, and lacked social skills and friends. However, the record establishes that the district court considered this evidence and sympathized with Samuel's terrible upbringing:

> THE COURT: All right. Let's go back on the record. This case has weighed very heavily on the Court. I don't even want to tell you how many times I've woken up in the night, thought about [Samuel]. I don't want to tell you how much time I've been – I've spent deciding what to do with the case, trying to make sure what my options are, making sure that I understand what my duties to society are, what my duties to [Samuel] are.

42

I will never forget the evidence in the case. I saw most of it several times. I have all of the psychologists in the case finding Reactive Attachment Disorder. I have two defense experts today testify he had a high risk for violence in the future if confronted, if trapped. That's consistent with the Court's [sic] expert.

This case has been a tragedy since [Samuel] was about five years old, and that's when it started. Nobody should have to go through what he went through in terms of a life. The results of that life are what we're dealing with today. The results of that life are not necessarily [Samuel's] fault.

Second, Samuel argues his age was not given due consideration. Samuel asserts that his young age was key to his crimes and should be equally significant in his sentence. Although Samuel was only 14-years-old when he committed the murders, based on the nature of Samuel's crimes the district court found that the facts were "too awful, [and] the risk . . . too high," to consider a juvenile disposition or a blended sentence.

Third, Samuel argues that his mental health concerns and potential for rehabilitation favored a lesser sentence, *e.g.*, Samuel has been diagnosed with persistent depressive disorder, reactive attachment disorder, a learning disability, other specified neurodevelopmental disorder, other specific trauma and stressor related disorder, and dysthymic disorder. Despite Samuel's claims that the district court did not give enough weight to his mental health concerns and potential for rehabilitation, he does not appreciate that "the primary objective" of sentencing is protecting society, along with the "related goals of deterrence, rehabilitation or retribution." *Toohill*, 103 Idaho at 568, 650 P.2d at 710. This is precisely what the district court did and, ultimately, the district court found that Samuel's reactive attachment disorder posed too great a future risk to the public.

The district court sentenced Samuel to a fifteen year unified sentence with ten years fixed, and five years indeterminate for the second degree murder charge, and a concurrent sentence of indeterminate life with twenty years fixed for the first degree murder charge. The court went through all the *Toohill* factors, placing emphasis on the protection of society and rehabilitation as opposed to punishment:

THE COURT: In considering the *Toohill* factors and the goals of sentencing in the state of Idaho, at least for adults, the overriding goal of sentencing is to protect the public. There are various ways to accomplish that. I can do it by specific deterrence. I can do it by general deterrence. I think specific deterrence does have some effect at least during a period of incarceration. It may not have a lot of effect post-incarceration. I can do it through rehabilitation, and this court believes in

43

rehabilitative justice. I've done rehabilitative justice for a long time. And I can do it by punishment.

It would be tempting to punish Mr. Samuel for the death of his brother. What that child went through in the last few minutes of his life had to be absolutely terrifying, especially considering his inability to regulate his emotions through no fault of his own. I don't put a lot of weight into punishment. Mr. Samuel, you're going to have to live with the fact you took [your brother's] life for the rest of your life, and whether you think it's fair or infair – unfair, whatever you think about it, it's always going to be coming back at odd moments. You're going to have those dreams for a long time about what if [your brother] hadn't died. It's at least understandable, while not excusable, with respect to your father given his history of treatment of you.

So the [c]ourt is predominately left with the issues of protecting society and the issues of rehabilitation. Testimony today here pretty much universally said you're going to need treatment for a long time, that when stressed you are at a substantial risk for violent outbreaks. That's probably what happened here is you acted in response to that. That goes to the issue of protection of the public.

We hold that the district court appropriately weighed the relevant factors and did not abuse its discretion in sentencing Samuel.

## V. CONCLUSION

The judgment of the district court is affirmed.

Chief Justice BURDICK, Justices BRODY, STEGNER and MOELLER, CONCUR.

44