# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47341

STATE OF IDAHO,                          )
                                                   )

    Plaintiff-Respondent,                )          Boise, January 2021 Term

                                                   )

v.                                                     )          Opinion filed: February 18, 2021

                                                   )

ALFREDO ALVARADO,                     )          Melanie Gagnepain, Clerk

                                                   )

    Defendant-Appellant.               )

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Twin Falls County. Roger B. Harris, District Judge.

The judgment of the district court is <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender, Boise, for Appellant. Jason Pintler argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. Jeff Nye argued.

_____

MOELLER, Justice.

In this appeal we are asked to clarify the meaning and extent of a defendant's Sixth Amendment right to conflict-free counsel. Appellant Alfredo Alvarado ("Alvarado") argues his rights were violated because his public defender had previously represented a witness who was adverse to him on a felony charge. After disclosing the conflict, Alvarado's attorney agreed that he and the public defender's office would decline any future representation of the witness. However, Alvarado argues that counsel continued to have an actual conflict of interest because his ongoing ethical duties to the witness and former client prevented him from effectively cross-examining the witness. Alvarado argues that this resulted in a structural defect in the trial, which necessitates overturning his convictions. In the alternative, Alvarado argues his unified aggregate sentence of twenty years to life for attempted strangulation and domestic abuse was excessive.

1

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On the night of July 13, 2018, the Twin Falls Police Department received a call to search for Tina Verret ("Verret"), who could not be found after she had left her home earlier that evening following an argument with her boyfriend, Alvarado. Officers eventually found Verret and Alvarado near a Lowe's Home Improvement store. Verret, who appeared to have been battered, told the officers Alvarado had tried to kill her. After law enforcement questioned both parties, Alvarado was arrested for domestic battery. He was later charged with three felonies—attempted strangulation, domestic battery, and intimidation of a witness—along with five misdemeanors concerning no-contact order violations and telephone harassment. Part II of the Information contained a persistent violator enhancement.

Verret's son, Garrett Peak ("Peak"), and his girlfriend, Kamille Davies ("Davies"), both witnessed the events that preceded the attack and observed Verret's injuries when she returned home. During the trial, the prosecution called Verret, Peak, and Davies to testify. Prior to the prosecution's direct examination of Peak, Alvarado's attorney, George Essma ("Essma") of the Twin Falls Public Defender's Office, notified the court that he had previously represented Peak on a felony possession of a controlled substance charge. Peak had pleaded guilty to that charge and had been placed on probation two months before Alvarado's trial. The Twin Falls Public Defender's Office was also representing Peak on pending misdemeanor charges for which he was presently in custody awaiting trial.

Essma explained that although the State had disclosed Peak on its witness list, he did not associate the name with his former client because the State had mistakenly listed Peak's address as the Twin Falls County Prosecutor's Office. Essma expressed concern that his prior relationship with Peak might create a conflict in his representation of Alvarado or future representation of Peak:

> I think in order for me to protect Mr. Peak's ability to be represented by fair and impartial counsel down the road, if that's what's going to happen—and I don't know—and for me to be able to proceed in this trial, I am going to have to—the Public—the Twin Falls Public Defender's Office is going to have to conflict any further activity on Mr. Peak's case to another attorney outside the main Public Defender's Office, I believe. So I just wanted to make a record of that.

The district court confirmed with Peak that he was currently in jail on misdemeanor charges and that he had not discussed those charges with Essma. The district court also observed that, given the misdemeanors, Peak might face probation violations in his felony case, and Essma would not be able to represent him. Peak agreed that Essma and the Twin Falls Public Defender's Office

could withdraw from future representation of him. Essma and the prosecutor each indicated they were satisfied with the record made by the district court. Alvarado was present, seated next to Essma when this discussion took place; however, the district court did not ask Alvarado if he still approved of Essma continuing to represent him in his case.

On direct examination, Peak was called to testify about the events leading up to and following the attempted strangulation and domestic battery of Verret. Peak wore a jail-issued orange jumpsuit while in court. He testified that Alvarado was dating Verret and had recently moved in with her. Peak, Davies, and Davies' young son also lived in the house. On July 13, 2018, Peak overheard Verret and Alvarado arguing about "indecent gestures" Alvarado had been accused of making toward Davies. Peak confronted Alvarado and asked him to leave, but Alvarado only went as far as the front yard, where he banged on the door and window, challenging Peak to fight him. Peak went outside and pushed Alvarado, who fell backwards over a bicycle and landed in the street. Peak asked Alvarado if he wanted to continue fighting and Alvarado declined. Verret and Davies came outside and Alvarado insisted that Davies had offered to have sex with him in return for drugs. Verret asked Davies and Peak to go inside and calm down. Peak smoked a cigarette before returning to the front yard where he found Alvarado and his mother had gone. Peak went out searching for Verret but did not find her. When Verret returned home later that night, Peak testified that she was "scared, frantic, [and] pretty battered" and that she "was bleeding from her nose and lips," "had clumps of hair missing out of her head," "had bruises on her throat [and] shoulders," and torn clothes.

Before Essma cross-examined Peak, the prosecutor moved to prohibit Essma from asking Peak about why he was in custody because Peak did not have any convictions that were admissible under Idaho Rule of Evidence 609 for impeachment purposes, and he was currently in custody for alcohol use. Essma countered that, as a general matter, he should be allowed to ask questions about who the witness was, stating, "[i]t's not getting into character; it's just a matter of setting the stage for where we're at with the witness the State proffered." Essma claimed that other judges had allowed him to ask a witness generally about whether he was in custody for a criminal matter and the nature of the criminal matter, as well as whether any people involved in the present case were also involved in the witness's criminal case. The district court said it would review Idaho Rule of Evidence 609, and Essma reiterated that his inquiry did not relate to character, saying, "the jury

3

sees a person coming in orange; I think they're entitled to have some basic questions answered. And they're relevant because I know why he's in jail."

Essma then pivoted and argued instead that the evidence was admissible under Idaho Rules of Evidence 401 and 403:

> Mr. Peak is alleged to have committed domestic violence in two misdemeanor cases against Kamille . . . Davies, the very person who had been—he has mentioned is a participant in the activity that he's testified to under oath. I think it's relevant for the jury to hear, 'Well, Mr. Peak, you've mentioned Kamille, but you yourself have committed a domestic battery against her; isn't that correct?' I think it's relevant.

The district court asked in what respect that information would be relevant, noting that it did not go to the witness's propensity for truthfulness. Essma answered that it was not a matter of truthfulness but was "probative," and that its probative value outweighed the risk of prejudice:

> Because he's on the stand testifying against my client as a witness to what he says is a domestic violence when he, in fact, is being accused of the same crime against one of the very people that were [sic] at the scene that have accused my client. And I think the jury could know, 'Gee, that's why he's in orange.' It's relevant, and it's more probative—why is it prejudicial? It's true. It's what happened. This is who the State put on. That's not my fault.

When the district court explained that it still did not understand how the information was relevant, Essma continued to argue that it was relevant to the weight the jury would give Peak's testimony because "[p]erhaps a juror would say 'Look, well, yeah, he's trying to take Mr. Alvarado down. It will make him feel better.' " The district court sustained the objection to the line of questioning about why Peak was in custody.

Essma then moved to strike Peak's testimony, arguing that the State violated a pre-trial discovery order because it had failed to disclose Peak's criminal record and that he was in jail. The State averred that Essma and the Twin Falls Public Defender's Office had represented Peak and so they knew about his criminal record and his incarceration and also offered a continuance to let Essma review Peak's criminal record. The district court overruled Essma's objection to Peak's testimony because once again it found no reason why Peak's prior convictions would be relevant. Once the cross examination began, Essma did not question Peak about his past convictions or why he was in custody.

Davies' testimony was similar to Peak's. She testified that Alvarado had made sexual comments about her, which Alvarado and Verret argued about on July 13, 2018. Davies also testified that Peak had intervened in the argument, asking Alvarado to leave, and that Alvarado

4

had stayed in the yard, yelling, and Peak had gone outside and pushed him. Davies stated that, when Verret returned home later, she was "very battered":

> She was very upset. Her hair was pulled out into pieces. You could see it shedding. She had scratch marks from her forehead all the way down to her chest. She was very in shock at first when she showed up. She wasn't crying yet. And then when she sat down, you could tell she was hurting. She was in a lot of pain.

Verret described essentially the same events as Davies and Peak leading up to her leaving the house with Alvarado. She then testified that later, when she tried to go home, Alvarado grabbed her by the arm, pulled her behind a gas station, and pushed her to the ground. Verret tried to leave again and Alvarado threw her to the ground and laid on top of her. When Verret tried to yell for help, Alvarado put a hand over her mouth and then a hand around her neck, squeezing her throat until she could not breathe. Alvarado then said he was sorry and phoned his sister and had Verret speak with her. Verret asked Alvarado's sister to phone 911, and Alvarado took the phone from Verret and slapped her. Verret then tried to run and Alvarado kicked her in the face and arm and told her "[y]ou're never going to go home again" and "[y]our kids will never see you again." He dragged her by the arm and hair to two other locations. Verret then told Alvarado he could come home with her. As they walked, Verret saw a police officer and ran toward him. The officer then intervened.

Officer Dixon testified about what happened when he responded to a call to search for Verret. Dixon testified that when he saw them, Verret came toward him saying, "I need you. I need you," and "[w]e need to get out of here." Officer Wendlandt also responded to the call and testified that Verret was examined by emergency service personnel because she was complaining about neck pain from being strangled. Officer Wendlandt also observed Verret running her fingers through her hair and removing clumps of hair. Officer Kraft, the lead officer, arrived at the scene and spoke with Verret. Officer Kraft "observed some marks on her neck" and that her nose looked swollen, and she had blood on her face and a cut on her leg. He also testified that it appeared Verret had been drinking, but was not impeded from communicating. Alvarado told Officer Kraft that he had also been injured, but Officer Kraft could not see any injuries on Alvarado. Alvarado told the officer that Verret's injuries occurred when she attempted to run away and fell down. However, Officer Kraft stated that Verret's injuries did not match with Alvarado's story. Officer Kraft then arrested Alvarado and charged him with attempted strangulation and domestic battery, and the district court entered an order prohibiting Alvarado from contacting Verret. While in jail, however,

5

Alvarado twice sent letters to Verret and phoned her multiple times, resulting in the four counts of violating the no contact order and one count of telephone harassment. The letters contained incriminating statements by Alvarado in which he admitted and apologized for the injuries he caused.

Alvarado testified to a different version of the events. Alvarado claimed that Davies would flirt with him when they were alone, which made him uncomfortable. He alleged that on July 13, 2018, he was at home with Davies and she propositioned him, asking him to buy her heroin in exchange for sex. Alvarado called Verret at work to tell her what had happened but Verret was busy. When Verret got home, she was angry Alvarado had kept calling her at work, and they argued about Davies. Both continued to drink beer and Verret became intoxicated. When he was in the front yard trying to explain what had happened, Verret, Peak, and Davies all started yelling at him, they pushed him against a car in the driveway, and punched him. Alvarado testified that he threw a punch that hit Verret, and Peak pushed Alvarado over his bicycle. Peak and Davies then went inside, and Alvarado and Verret went for a walk. He testified that Verret was still intoxicated and not wearing shoes, and she fell over, injuring herself.

The jury found Alvarado guilty of attempted strangulation, domestic battery, four no contact order violations, and telephone harassment; however, he was acquitted of intimidating a witness. Alvarado then admitted to the persistent violator enhancement in Part II of the Information. Alvarado was later sentenced on the two felony counts to a unified aggregate sentence of life imprisonment, with the first twenty years fixed.[1] He timely appealed.

## II. STANDARD OF REVIEW

This case primarily concerns an indigent defendant's right to counsel, as protected under the Sixth Amendment to the U.S. Constitution. We freely review constitutional issues, which are questions of law. *State v. Baeza*, 161 Idaho 38, 40, 383 P.3d 1208, 1210 (2016). However, in determining whether a defendant has been properly afforded his rights under the Constitution in a particular case, we must look to the facts as found by the trial court. We will defer to the trial court's factual findings unless they are shown from the record to be clearly erroneous. *State v. Samuel*, 165 Idaho 746, 755, 452 P.3d 768, 777 (2019).

---

[1] The district court also sentenced Alvarado to 180-day concurrent sentences on each of the misdemeanor charges; however, he has only appealed his felony sentences.

## III. ANALYSIS

**A.** **Alvarado has failed to show his counsel's representation constituted a fundamental error.**

Where a defendant alleges a constitutional violation occurred during trial, but failed to make a contemporaneous objection, Idaho appellate courts apply the fundamental error doctrine. *State v. Miller*, 165 Idaho 115, 119, 443 P.3d 129, 133 (2019), *reh'g denied* (June 12, 2019). To obtain relief under the fundamental error doctrine, an appellant must show the following:

> (1) the defendant must demonstrate that one or more of the defendant's unwaived constitutional rights were violated; (2) the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) the defendant must demonstrate that the error affected the defendant's substantial rights, meaning (in most instances) that it must have affected the outcome of the trial proceedings.

*Id.* (quoting *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010)). Inasmuch as Alvarado did not object to a possible conflict of interest at the trial, he must meet this standard to succeed on his claims. Thus, in order to establish that his Sixth Amendment right to conflict-free counsel was violated, Alvarado must show that Essma's prior representation of Peak and continued representation of Alvarado constituted fundamental error. He has failed to do so.

### 1. Alvarado has failed to demonstrate a violation of his right to counsel.

The first prong of the fundamental error doctrine requires a defendant to show a violation of an unwaived constitutional right. *See Miller*, 165 Idaho at 119, 443 P.3d at 133. The U.S. Supreme Court has held that a defendant who did not object at trial to their counsel's conflict of interest can establish a violation of their Sixth Amendment rights by demonstrating "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). According to Alvarado, Essma's ongoing duties to Peak were directly adverse to Alvarado's interests because Essma was prevented from cross-examining Peak about his probationary status—a status which left Peak open to possible influence by the State, but which Essma did not point out. *See* U.S. Const. amend. VI. Thus, we must first determine whether the respective duties Essma owed to Peak and Alvarado created an actual conflict of interest that adversely affected Essma's cross-examination of Peak.

According to the Idaho Rules of Professional Conduct, a lawyer shall not represent clients with a concurrent conflict of interest unless each client provides informed consent, in writing. I.R.P.C. 1.7(b). The rule describes circumstances where a concurrent conflict of interest exists,

7

including where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by the personal interests of the lawyer, including family and domestic relationships." I.R.P.C. 1.7(a)(2). The comments to Rule 1.7 emphasize that "[c]oncurrent conflicts of interest can arise from the lawyer's responsibilities to . . . a former client[.]" I.R.P.C. 1.7 cmt. 1. Although Essma and the public defender's office had declined any future representation of Peak prior to Essma's cross-examination of him, we must nonetheless consider whether Essma's ongoing duties to Peak as a former client created a "significant risk" that Essma would be "materially limited" in effectively questioning Peak. Several factors persuade us that no such significant risk existed.

First, the Idaho Rules of Professional Conduct describe the duties owed to former clients, which include that "[a] lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:"

> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known . . . .

I.R.P.C. 1.9(c)(1). Again, the comments clarify the rule: "[t]he underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question." I.R.P.C. 1.9 cmt. 2. Importantly, Comment 3 adds further clarification: "Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying . . ." I.R.P.C. 1.9 cmt. 3.

Alvarado argues that Essma was ethically obligated "to advise Mr. Peak about his Fifth Amendment right against self-incrimination," which he states prevented Essma from asking about Peak's probationary status. There are two problems with this argument. First, Peak's convictions and probationary status were public information at the time of Alvarado's trial. Thus, Essma did not owe a duty of confidentiality to Peak to withhold such information because the State was already aware of Peak's past and current criminal charges. Second, the use of public information about Peak's probation status or past record to suggest bias was not incriminating—it only would have affected his credibility in this proceeding. Had Essma cross-examined Peak about his probationary status at trial, it would not have necessarily resulted in any self-incriminating disclosures. Any attempt to impeach Peak's testimony by suggesting that he had made a deal with the State, or that he maintained a hope that his testimony would somehow curry favor with the State, is not comparable to counsel "changing sides" on a matter in which he represented a client.

8

Eliciting testimony from a former client that may damage his credibility in a proceeding where he is merely a witness, is not equivalent to violating his right to self-incrimination or "changing sides," provided the testimony only concerns matters of public record and does not breach the continuing duty of confidentiality.

We must also consider whether the district court satisfied its duty to inquire about the potential for bias.

> [A] trial court has an affirmative duty to inquire into a potential conflict whenever it knows or reasonably should know that a particular conflict may exist. [A] trial court's examination of the potential conflict must be thorough and searching and should be conducted on the record. The adequacy of the trial court's inquiry is a constitutional issue over which we exercise free review.

*State v. Hall,* 163 Idaho 744, 793, 419 P.3d 1042, 1091 (2018) (internal quotations omitted). A court's determination of whether an actual conflict of interest exists "rests in large part on analysis that only defense counsel can conduct." *Id*. at 793, 419 P.3d at 1091 (citing *Cuyler*, 446 U.S. at 346 ("[T]rial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel" in determining the presence of a conflict.)).

This Court has observed that, while courts rely on the Idaho Rules of Professional Conduct to determine whether an actual conflict exists, the body of analysis is dependent on "specific and complete information about the nature and depth of each client's representation by counsel, which is information only counsel would have." *Hall*, 163 Idaho at 793, 419 P.3d at 1091. In *Hall*, we found that the district court did not err in relying on defense counsel's assessment that no conflict was present between Hall and a witness whom counsel also represented, nor did the district court err in allowing questioning of the witness to proceed based on counsel's assessment. *Id.* This also reflects the U.S. Supreme Court's holding in *Cuyler* that a trial court is required to investigate timely objections to multiple representation; however, if no objection is made a trial court may assume that no conflict exists. *Cuyler*, 446 U.S. at 346.

Here, Essma notified the district court that he had represented Peak in the past and that he and the public defender's office would decline future representation of Peak. The district court noted that Peak was currently incarcerated on misdemeanors—on which Essma had not represented him—and that Peak might face probation violations on his felony case. Peak agreed that Essma and the public defenders' office could withdraw from future representation, and Essma and the prosecutor stated that they were satisfied with the arrangement. No one raised the issue of whether those potential probation violations might create a conflict of interest in the present case.

9

However, the district court did not err in relying on Essma to evaluate the potential for an additional conflict of interest. As *Cuyler* establishes, because no further objection was made, the district court was free to assume no other conflict existed. Further, the district court, like the court in *Hall*, was permitted to rely on counsel's assessment of the potential for conflict and to proceed with the cross-examination.

Finally, even if an actual conflict existed, there is substantial evidence that Essma's performance was not adversely affected by it. Essma *attempted* to question Peak about his current incarceration, explaining first to the court that it was merely background information and later that he wanted to introduce the fact that Peak had also committed an act of domestic violence, thereby undermining Peak's credibility. However, the district court rejected this line of questioning, finding it irrelevant to the witness's reputation for honesty. Although Essma did not point to the potential for demonstrating bias due to the State's supposed influence over Peak, the fact that Essma attempted to ask questions about Peak's incarceration still strongly suggests Essma was not avoiding the issue of Peak's convictions out of a professional ethical duty. *See Chippewa v. State*, 156 Idaho 915, 921–22, 332 P.3d 827, 833–34 (Ct. App. 2014) (quoting *Mickens v. Taylor,* 240 F.3d 348, 361 (4th Cir.2001) (en banc) "[T]he [defendant] must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.")). This situation is similar to *Hall*, where this Court found that a potential conflict had no adverse effect because the witness, whom counsel also represented, testified in an orange jumpsuit and the defense attorney asked about the circumstances of her confinement. 163 Idaho at 794, 419 P.3d at 1092. This Court found Hall's attorney had not treated the witness in an appreciably different manner from any of the other witnesses, which supported its finding that any conflict of interest had not had an adverse effect on counsel's performance. *Id.* Similarly, Peak appeared in court in an orange jump suit, and Essma attempted to question Peak about his incarceration. Though the district court did not allow him to proceed with that line of questioning, his attempt indicates that he treated Peak as he would have any other witness, regardless of their past attorney-client relationship. Thus, there is no indication Essma's prior representation of Peak had an adverse effect on his actual performance. For these reasons, we hold that Alvarado's right to conflict-free counsel was not violated, and he has failed to satisfy the first prong of the fundamental error doctrine.

**2. Alvarado has failed to identify an error that was clear or obvious from the record.**

The second prong of the fundamental error doctrine requires that "the error must be clear or obvious, without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision." *See Miller*, 165 Idaho at 119, 443 P.3d at 133 (quoting *Perry*, 150 Idaho at 226, 245 P.3d at 978). In *Miller*, this Court clarified the second prong of *Perry*, stating "the record must contain evidence of the error and the record must also contain evidence as to whether or not trial counsel made a tactical decision in failing to object." *Id.* at 119, P. 3d at 133. To meet this standard, it is insufficient for appellant's counsel to merely contend that a failure to object could not have been tactical because "failing to object could not have benefitted the defendant." *Id.*

Alvarado asserts that, even if Essma's decision to not question Peak about potential bias based on his probation status was tactical, Essma had no right to make such a tactical decision because it effectively waived Alvarado's constitutional right to conflict-free counsel. In support, he cites *State v. Vasquez*, 163 Idaho 557, 416 P.3d 108 (2018), in which this Court found clear error in the record because the district court allowed counsel to proceed with a bench trial without asking whether the defendant knowingly and voluntarily waived her right to a jury trial. Alvarado claims that, here, the district court failed to verify he waived his right to conflict-free counsel. According to Alvarado, the district court's failure to ask whether he waived his right constitutes clear error.

However, Alvarado makes an inferential leap that the *only* reason Essma did not raise the issue of bias is because of his professional duties to Peak. That connection is not apparent from the record. In fact, Essma's statements to the court more strongly suggest that he had no such motive inasmuch as he pushed rather strenuously for leeway to elicit even more damaging information about Peak's record. By contrast, allowing a waiver of a right to a jury trial without voluntary and knowing consent in *Vasquez* was, by nature of the rules of criminal procedure, a self-evident error. Idaho Criminal Rule 23(a) states that waiver of a jury trial requires the written approval of the defendant in open court. Thus, a district court proceeding with a bench trial without a defendant's approval is a clear violation of that rule, which protects the right to a jury trial, and by extension shows the right has been violated. The right to conflict-free counsel, on the other hand, does not exist within such definite boundaries because it is tempered by the reality that court-appointed counsel often represent clients with overlapping interests, and the judge must rely on defense counsel to disclose the extent and nature of such conflicts. Accordingly, any resulting error

11

cannot be considered either "clear or obvious." *Miller*, 165 Idaho at 119, 443 P.3d at 133 (quoting *Perry*, 150 Idaho at 226, 245 P.3d at 978). Instead the Idaho Rules of Professional Conduct reflect that conflict is situation specific. *See* I.R.P.C. 1.9 cmt. 2.

The appellate record does not show that Essma's failure to pursue questioning Peak about his probation status stems from a conflict of interest as opposed to a ruling of the court or tactical decision. As such, Alvarado also does not satisfy the second prong of the fundamental error doctrine.

### 3. Alvarado has neither demonstrated that an error affected the outcome of the trial, nor shown that a structural error denied him the right to counsel during a critical stage of the proceeding.

In *Miller*, this Court clarified that the third prong of the fundamental error doctrine "requires that the defendant demonstrate that the clear error in the record—*i.e.,* the error identified in the first and second prongs—actually affected the outcome of the trial proceedings." *Miller*, 165 Idaho at 119–20, 443 P. 3d at 133–34. However, Alvarado does not argue actual harm resulted from the conflict of interest. Instead, Alvarado relies on *Mickens v. Taylor*, 535 U.S. 162 (2002) to assert that the harm was structural, depriving him of counsel at a critical stage in the proceedings.

In *Mickens*, the U.S. Supreme Court explained that, "where assistance of counsel has been denied entirely or during a critical stage of the proceeding," the Court has "spared the defendant the need of showing probable effect upon the outcome, and ha[s] simply presumed such effect . . . ." 535 U.S. at 166. The Court continued:

> When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. See *Cronic, supra,* at 658–659, 104 S.Ct. 2039; see also *Geders v. United States,* 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Gideon v. Wainwright,* 372 U.S. 335, 344–345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). But only in 'circumstances of that magnitude' do we forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict. *Cronic, supra,* at 659, n. 26, 104 S.Ct. 2039.

*Id.* The U.S. Supreme Court held that a defendant did not need to show prejudice where defense counsel "*actively represented* conflicting interests," such as when conflict arose from "multiple concurrent representation." *Id.* at 174–75 (emphasis in original). The Court left open the question of whether a presumption of prejudice would apply in conflict of interest cases where representation was successive. *Id.* at 176.

A "concurrent *conflict*," as described in Rule 1.7(a)(2) of the Idaho Rules of Professional Conduct may involve a current and a former client. However, this is distinct from "concurrent

*representation*" which requires, by definition, that counsel represented both clients on the same or a substantially related matter. *See Mickens*, 535 U.S. at 175. In *Mickens*, the U.S. Supreme Court observed that concurrent and successive representation are treated differently in the Federal Rules of Criminal Procedure, requiring a court to "inquire into the likelihood of conflict whenever jointly charged defendants are represented by a single attorney . . . but not when counsel previously represented another defendant in a substantially related matter, even where the trial court is aware of the prior representation." *Id.* (quoting *Cuyler*, 446 U.S. at 346 n.10). At the time of Alvarado's trial, Essma was no longer representing Peak for the felony charge for which Peak was on probation, nor was the Twin Falls Public Defender's Office currently representing Peak because he had already been sentenced on his misdemeanor charges. Alvarado's case did not overlap with any of Peak's cases, past or current. Therefore, Essma's representation of Alvarado and Peak was successive rather than concurrent.

The U.S. Supreme Court did not determine in *Mickens* whether the presumption of prejudice would apply to successive representation, *Mickens*, 535 U.S. at 176, and the issue is one of first impression for this Court. However, in *Sparks v. State*, the Idaho Court of Appeals found that a presumption of prejudice does not apply to successive representation. 140 Idaho 292, 297, 92 P.3d 542, 547 (Ct. App. 2004). *Sparks* involved a conflict of interest based "on an attorney's perceived obligation to a client he represented nine years earlier on an unrelated matter." *Id.* at 297, 92 P.3d at 547. The Court of Appeals observed that, in *Mickens*, the U.S. Supreme Court had based its determination that a defendant did not need to prove prejudice where defense counsel had actively represented conflicting interests during multiple, concurrent representation on the high likelihood that those circumstances would lead to an unreliable verdict. *Id.* The Court of Appeals noted that the Federal Rules of Criminal Procedure treat conflicts of interest in concurrent versus successive representation differently, and determined that the likelihood of an unreliable verdict, which justified the presumption of prejudice under *Cuyler*, was not equivalent in cases of successive representation. *Id.*

Alvarado urges that *Sparks* must be overturned, invoking *United States v. Cronic* to support the proposition that the right to counsel exists "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." 466 U.S. 648, 658 (1984). According to Alvarado, a defendant who can prove that an actual conflict of interest adversely affected counsel's performance during a critical stage of the trial, should not also have to prove harm. We disagree.

13

The U.S. Supreme Court stated in *Mickens* that the presumption of prejudice was appropriate under "circumstances of [a] magnitude" where the verdict was so likely to be unreliable that case-by-case inquiry was not necessary. 535 U.S. at 184 n.8. Alvarado has not presented a circumstance of sufficient magnitude to warrant application of the presumption here. The *Mickens* Court cited *Cronic* in asserting that not all conflicts of interest require proving prejudice. *Mickens*, 535 U.S. at 166. *Cronic* highlights that the purpose of the Sixth Amendment is to ensure a defendant receives a fair trial and allows that prejudice may be presumed where counsel has been denied at a critical stage in the proceeding, or "entirely fails to subject the prosecution's case to meaningful adversarial testing" such as during cross-examination. *Cronic*, 466 U.S. at 659. Presumption of prejudice is also appropriate where counsel is available but circumstances are such that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is . . . small . . . ." *Id.* at 659–60. An attorney actively representing conflicting interests in concurrent representations poses such a circumstance where ineffective assistance is so likely that prejudice may be presumed. *See Mickens*, 535 U.S. at 175. However, the same cannot be said for successive representation, especially where the interests involved are unrelated to the former client's case. While successive representation, like in the case at bar, may suggest an apparent conflict of interest, at most it amounts to a cosmetic crack in the exterior of the trial proceedings; the overall foundation—and our confidence in the outcome—remains firm nonetheless. For these reasons, we hold that claims of conflict of interest relating to successive representation require a showing of actual prejudice.

Alvarado acknowledges that he cannot prove harm as a result of the alleged conflict of interest. The facts bear this out. Peak was not a direct witness to the attempted strangulation nor the domestic battery. Instead, he merely provided foundational testimony, which was duplicated by Davies and Verret, regarding the events that led up to Verret taking a walk with Alvarado and about her injuries when she returned home later. His testimony concerning the events leading to the attack helped set the stage for the later altercation, but it was largely cumulative. Most importantly, it did not touch on any of the acts the State was required to prove as part of the required elements of the crimes Alvarado was charged with at trial. Even without the testimony of Peak and Davies, Verret's testimony, coupled with the corroborating evidence of her injuries and Alvarado's incriminating statements before and after his arrest, would have been sufficient. Indeed, the recordings of Alvarado's prison phone calls, his letters to Verret, and the arresting

14

officers' body-cam footage after the incident provide far more bases for conviction than anything to which Peak testified. If Essma had questioned Peak about bias and completely discredited his testimony in the eyes of the jury, or if the district court had determined that Peak could not testify at all, we are satisfied that it would not have changed the outcome of the case. Accordingly, Alvarado cannot satisfy the third prong of the fundamental error doctrine.

## B. The district court did not abuse its discretion in sentencing Alvarado to 20 years to life.

Where a district court has imposed a sentence within its statutory limits, "the appellant bears the burden of demonstrating that it is a clear abuse of discretion." *State v. Miller*, 151 Idaho 828, 834, 264 P.3d 935, 941 (2011) (internal quotations omitted). In analyzing whether a trial court abused its discretion at sentencing, this Court considers if the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Villa-Guzman*, 166 Idaho 382, 384, 458 P.3d 960, 962 (2020) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)). "In deference to the trial judge, this Court will not substitute its view of a reasonable sentence where reasonable minds might differ." *Miller*, 151 Idaho at 834, 264 P.3d at 941 (quoting *State v. Stevens,* 146 Idaho 139, 148–49, 191 P.3d 217, 226–27 (2008)). Furthermore, "[a] sentence fixed within the limits prescribed by the statute will ordinarily not be considered an abuse of discretion by the trial court." *State v. McIntosh*, 160 Idaho 1, 8, 368 P.3d 621, 628 (2016) (quoting *State v. Nice,* 103 Idaho 89, 90, 645 P.2d 323, 324 (1982)).

The district court sentenced Alvarado to consecutive sentences on the two felony charges. For the charge of attempted strangulation, he received a fixed sentence of ten years in prison and an indeterminate sentence of life. For the charge of domestic violence inflicting traumatic injury, he received a consecutive fixed sentence of ten years with no additional indeterminate sentence. Thus, Alvarado's aggregate sentence on the two felony convictions was twenty years fixed with an indeterminate sentence of life. Each sentence, whether separate or combined, fell within the statutory bounds of the court's discretion. Nevertheless, Alvarado argues that his sentence is excessive because the district court did not adequately account for mitigating factors, including his alcohol use and willingness to participate in treatment, as well as remorse for his actions—all factors which trial courts should consider in sentencing. *See State v. Gratiot*, 104 Idaho 782, 663

P.2d 1084 (1983); *State v. Nice*, 103 Idaho 89, 645 P.2d 323 (1982); *State v. Albers*, 121 Idaho 204, 824 P.2d 135 (Ct. App. 1991).

As noted, Alvarado's sentences were all within statutory guidelines. Attempted strangulation carries a maximum sentence of fifteen years. *See* I.C. § 18-923. Felony domestic battery carries a maximum sentence of ten years. *See* I.C. § 18-918(2)(a). However, Alvarado was also convicted of being a persistent violator, which required the district court to sentence him to between five years and life in prison. *See* I.C. § 19-2514. The district court effectively sentenced him to life with twenty years fixed by giving him two consecutive ten-year sentences. This Court presumes "that the fixed portion of the sentence will be the defendant's probable term of confinement." *State v. Oliver*, 144 Idaho 722, 726, 170 P.3d 387, 391 (2007). Beyond the fixed sentence, the time a defendant will serve is then left to the parole board, and "[c]ourts cannot intrude on this discretion when fashioning a sentence nor when reviewing a sentence." *Id.* (quoting *State v. Huffman,* 144 Idaho 201, 203, 159 P.3d 838, 840 (2007)).

We cannot find an abuse of discretion in the district court's sentencing of Alvarado. Alvarado has not proved the district court failed to consider mitigating factors, nor that it did not consider the impact of intoxication. At sentencing, the district court provided a detailed explanation of the reasons for its sentence. It addressed the "primary factors the Court has to consider in fashioning a sentence, delineating them as rehabilitation, retribution, deterrence, and the good order and protection of society." *See State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982). The district court further reviewed in detail the factors set forth in Idaho Code section 19-2521 which direct a court to consider both mitigating and aggravating factors in fashioning its sentence, including the charge to avoid "imposing sentence of imprisonment unless, having regard to the nature and circumstances of the crime and the history, character and condition of the defendant, it is of the opinion that imprisonment is appropriate for protection of the public. . . ." I.C. § 19-2521(1).

In so doing, the district court addressed both aggravating and mitigating factors in Alvarado's history. It reflected on Alvarado's long history of alcohol abuse and concluded that the record "clearly convinces me that you are a threat to society unless you receive long-term treatment, whether it be for alcohol or drugs." The district court noted that although Alvarado contends he is remorseful, he refused to take responsibility and repeatedly violated the court's no-contact order while in jail by continuing to phone Verret and write her harassing letters. Further,

16

this was a crime of considerable violence—the injuries Verret sustained at Alvarado's hands were severe, including a broken nose, marks on her throat from the attempted strangulation, headaches from Alvarado kicking her in the face, torn out hair, and an injured shoulder, as well as serious mental trauma.

Additionally, the district court recounted Alvarado's extensive criminal history. In addition to a prior domestic violence charge and violations of protective orders, Alvarado had at least ten prior felony convictions in Utah between 1998 and 2017 for two attempted robberies, absconding, forgery, three cases of illegal possession/use of a controlled substance, two retail thefts (shoplifting), and theft. His previous misdemeanor convictions include driving under the influence, theft, criminal mischief, assault, criminal trespass, marijuana possession, disorderly conduct, intoxication, attempted possession of a dangerous weapon, and attempted aggravated assault. While in custody at the Twin Falls County Jail awaiting disposition of this case, jail records admitted at sentencing show Alvarado was disciplined for arguing with staff, possessing a shank, fighting, and encouraging a riot. In sum, we conclude that the strict sentence Alvarado received is completely consonant with the totality of the evidence presented at sentencing

Accordingly, we hold that the district court acted within the boundaries of its discretion, applying the correct statutory guidelines and exercising reason, in arriving at the twenty-years to life sentence for Alvarado's two felony convictions.

## IV. CONCLUSION

For the forgoing reasons, we hold that Alvarado was not deprived of his Sixth Amendment right to conflict-free counsel. We also hold that the district court did not abuse its discretion in sentencing Alvarado to a twenty-year to life aggregate sentence on his two felony convictions.

Chief Justice BEVAN and Justices BURDICK, BRODY and STEGNER **CONCUR.**